UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MASHELIA GIBSON,<br><br>      *Plaintiff*,<br>v.<br><br>MARYLAND MOTOR VEHICLE ADMINISTRATION,<br><br>      *Defendant*. | Civil Action No. 20-3220-PX |

## DECLARATION OF MASHELIA GIBSON

I, Mashelia in accordance with 28 U.S.C. § 1746, testifies truthfully, under the penalty of perjury, to the following:

1. I am over 18 years of age, have personal knowledge of the factual matters set forth in this Declaration, and state that they are true and correct.

2. From January 4, 2017, until my termination on August 13, 2019, I was employed by the MVA as a Vehicle Compliance Agent ("VCA"), in its VEIP/Vehicle Inspection Division ("VID"). In June 2018, I was promoted to a VCA II position.

3. I was the first female VCA that worked in the VID. I always was rated as at least a satisfactory performer, including in 2019.

4. When I was hired by the MVA, I had no automotive experience. I had some mechanical experience from working at MDTA inspecting commercial trucks. I was given sporadic, one-on-one training from my co-workers, but they were aggravated at having to train me.

5. My supervisors had no problems with my job performance in 2019.

6. As a VCA, I conducted compliance and safety inspections of Type B school buses to ensure their (1) safe operating condition and fitness for transporting students; and (2)

1

compliance with federal and state motor vehicle laws, rules and regulations, including the Code of Maryland Regulations ("COMAR").

7. Type B school buses are the "long" school buses that transport school students. Type A school buses are shorter and are used to transport disabled students and students with special needs.

8. I regularly conducted scheduled, as well as random, visual inspections of Type B school buses, processed waivers and issued citations with appropriate penalties for non-compliant vehicles. Type B inspections were conducted in the presence of the school bus operator's representatives, as well as representatives from the local school boards. I was authorized to remove (take) tags from school buses failing to comply with COMAR requirements. Those tags would be returned to the bus operators upon remediation of the problems noted in the citations.

9. In conducting scheduled or random inspections, I was required to travel, in a state vehicle, throughout the entire State of Maryland to inspect school buses at the school systems' and contractors'/operators' school bus lots. I usually traveled alone, although occasionally I would be accompanied by a fellow VCA. Ridesharing could be done at supervisors' direction or, if their schedules were compatible, among the VCAs themselves, without supervisory approval.

10. From early 2019, until my termination, my immediate supervisor was William Chafin. My second-level supervisor was Michael Groff (Caucasian male), Section Manager – VEIP/Vehicle Inspection Division.  Prior to Groff's promotion in early 2019, he was my immediate supervisor.

11. During the entire time that I worked in the VID, I was the only female VCA.  There were seven (7) other VCAs; two were African American, Lawrence Washington and Kenneth Garnett; and four were Caucasian males: Alfred Morgan, Erik Faatz, Steve Brown and Jeff Henieck. Another VCA, Merennege Salgado, was Sri Lankan.

12. Groff told me that I was the "first and only female that he would hire." He also laughed at, condoned and refused to censure VCAs Morgan and Faatz, who commented that I was "dumb." Although I reported those comments to Groff, he took no remedial action.

13. Groff made racially insensitive comments that, when conducting inspections, I should not ride with another African American VCA because it "looks strange." During a VID staff meeting presided over by Groff, VCA Morgan told me that "you need to stop complaining about everything because, in the history of the department, we have had one other black employee and if anyone deserved to get shot, it was him." Groff laughed at VCA Morgan's comment and did not censure him.

14. During a school bus inspection in St. Mary's County, VCA Morgan, in front of St. Mary's County Public Schools representatives, repeatedly referred to me as "it," telling the school officials that they should disregard "it." I reported VCA Morgan's shocking comments to Groff, but he was unconcerned. Neither Groff nor any other MVA manager took effective remedial actions concerning the racial and misogynistic comments uttered by my co-workers.

15. From late 2017 until early 2019, I was subjected to vile, threatening racist and misogynistic comments from State of Maryland bus contractors and various school system employees. At the time of each incident, I reported them to Mike Groff. He was unconcerned and flippantly told me that I would have to "get used to it." I reported the following harrowing racial and misogynistic incidents to Michael Groff:

    a) In October 2017, while doing an inspection, I asked to use the contractor's restroom. The contractor refused to allow me that convenience and instead gave me a bucket in which to urinate;

    b) On January 18, 2018, while I was driving in Calvert County on MVA business, a driver in a green pickup truck cut me off, screaming "pull over you black bitch," and "fuck you." After the driver cut me off, the pickup truck's driver put me in danger by blowing black diesel exhaust smoke onto my windshield,

obscuring my vision. I reported that dangerous encounter to Groff, but he was indifferent to my complaint, telling me just to get used to it;

c) On March 28, 2018, VCA Lawrence Washington and I were conducting an inspection at Gilbert Bus Company, located in North East, Cecil County. Representatives from the Cecil County Board of Education were scheduled to be present. When Washington and I arrived at the site, the owner/state contractor, Joseph Gilbert (Caucasian male), drove his vehicle in menacing "donuts" around our state vehicle, shouting at us "move that fucking truck off my property"! When Washington and I showed Gilbert our state ID cards, Gilbert said that "I only see two black people wearing all black." He told Washington and me that "around here we shoot first, ask questions later." When I attempted to discuss the inspections to be conducted, Gilbert belligerently asked me what I was afraid of and pulled out a 6-foot-long bear taser. Gilbert pointed the taser at Washington and again asked me what I was afraid of. After I politely asked Gilbert to put away the bear taser, Gilbert released his aggressive guard dog and took out a large snake. Gilbert's actions were highly threatening and placed me in fear of an immediate harmful and offensive touching of my person. My fear was reasonable. On February 1, 2017, I had witnessed Gilbert place his hands around VCA Brown's throat, "playfully" pretending to strangle him. Gilbert's actions were witnessed by representatives of the Cecil County Board of Education. I called Groff to report Gilbert's outrageous threats and assaultive behavior. Groff was indifferent to my complaint, telling me that "Gilbert is not used to you yet.";

d) On March 28, 2018, Washington and I also went to perform inspections at Dvorak's Garage, LLC, located in Elkton, Cecil County. When I got out of the state vehicle, the owner, Robert Dvorak (Caucasian male), released his mastiff guard dog, weighing more than 125 pounds. It lunged at me, causing me to flee

4

    back to my vehicle for safety. Washington and I were prevented from doing our investigation. I was placed in fear of an imminent assault. I reported Dvorak's actions to Groff, who was indifferent to the assault experienced by me and again told me that I had to get used to it;

  e) In August 2017, a Caucasian male owner/state-contractor, who permitted his drivers to drive school buses adorned with Confederate flags (a COMAR violation), tore up a citation issued by me, calling me a "nappy-headed nigger." I reported the owner's comments to Groff, but he took no effective remedial action;

  f) On August 27, 2018, Kenny Garrett and I arrived for an inspection at the Carroll County Public Schools ("CCPS") facility in Westminster, Carroll County, Maryland. A school official, who identified herself as "Kim," greeted us rudely, telling us that "no one told us that you were black." I reported the CCPS's representative's comments to Groff, but he took no effective remedial action;

  g) On September 26, 2018, at Moxley Bus Company, in Bel Air, Harford County, Maryland, I asked a mechanic (Caucasian male) for permission to use a rest room. The mechanic, while pointing at a sign that read "For Whites Only," told me that "we don't have one for you." I reported that comment to Groff, but he took no effective remedial action;

16. Those incidents individually and cumulatively had a devastating debilitating effect on my mental health. After being diagnosed with severe anxiety and depression, my medical providers placed me on psychotropic medications.

17. Those medical conditions also adversely affected my ability to do my job, interfering with my ability to perform inspections efficiently and effectively, and by making me extremely anxious about performing inspections on the Eastern Shore and in parts of western and northeast Maryland.

18. After I complained to Groff about the repeated abusive racist and misogynistic behavior from school system employees and bus contractors, I began to experience additional harassment and retribution from Defendant.

19. On October 17, 2018, I conducted inspections in Garrett County. Two other VCAs (Kenneth Garrett and Eric Faatz) assisted me. They had traveled together in another vehicle. Late that afternoon, Groff directed Faatz and Garrett to return, leaving me alone in a remote area, with irregular, weak cell phone coverage. I was alarmed with being stranded alone in a remote part of the state.

20. As of late November 2018, I had two traffic citations for speeding.

21. On November 28, 2018, Groff informed me that someone had reported to MVA's Administrator, Christine ("Christy") Nizer, that he had seen me "blowing past them on the highway." Groff told me to turn in my state vehicle. I had not been speeding and MVA never gave me any documents reflecting that I had been speeding. I never received any traffic citations for my driving on November 26, 2018, or at any other time in late 2018.

22. On November 30, 2018, Groff told me that the decision to suspend my driving privileges was made by someone above his pay grade and that I "must have pissed someone off." For the next three weeks, I was required to drive my personal vehicle to perform my job. The suspension was lifted in late December 2018 and my state vehicle was returned to me. No Caucasian or male VCAs had their driving privileges suspended based on unsubstantiated reports of speeding unaccompanied by any tickets or other documentation that they were speeding. I never received any discipline, formal or informal, for the alleged speeding incident.

23. That suspension imposed severe hardship on my ability to work, requiring me to use my unreliable personal vehicle, an MVA fleet vehicle (of which there was a very limited supply) or ride along with other co-workers.

24. Riding-sharing with my co-workers sometimes was problematic since those other VCAs had inspections scheduled in parts of the state that were incompatible with my schedule.

25. On December 6, 2018, I filed Charge No. 531-2019-00710 with the EEOC, alleging sex and race discrimination arising from the removal of my state vehicle, as well as harassment because of my race and gender and unlawful retaliation.

26. Because I was concerned about the disparate removal of my vehicle, as well as the harassment that I was experiencing from Groff, my co-workers and school bus owners/state-contractors, on December 17, 2018, I filed an EEO complaint with the MDOT Office of Civil Rights and Fair Practices ("OCRFP"). It was assigned OCRFP Case No. 2019-T7-005.

27. On December 21, 2018, I was scheduled to meet with Groff's supervisor, Deborah Rogers (MVA's Director of Vehicle Safety and Compliance), about my EEO complaint. That meeting did not occur.

28. Ms. Fowler, from the MVA's OCRFP, called me on January 4, 2019, and pressured me to withdraw my OCRFP complaint and my EEOC charge of discrimination. I told Ms. Fowler that I refused to do so.

29. I met with Rogers, Groff and Genice Fowler, MVA's Lead EEO Officer, on January 10, 2019, regarding ORCFP Case No. 2019-T7-005. Ms. Fowler told Rogers that they needed to meet with me because I already had filed a charge of discrimination with the

EEOC. Rogers told me that she had an open-door policy. Rogers told me that I should have come to her before I filed my complaints. During that meeting, I explained the vile harassment, discrimination and retaliation that I was experiencing from Groff, co-workers and school bus contractors and representatives from local school systems. When I described the Gilbert Bus incident, Rogers was outraged and asked Groff why she was just hearing about it. Groff responded that he did not think that the reported incidents needed to be escalated. That EEOC charge of discrimination, Charge No. 531-2019-00710, had been filed on December 6, 2018, and the MVA and managers Rogers and Groff were aware of that charge of discrimination.

30. On January 17, 2019, my state vehicle was undergoing maintenance and a pool car was unavailable. I arranged to ride with VCA Washington to do inspections on the Eastern Shore (where I had been scheduled contrary to Nizer's direction). That day, while Washington and I were doing inspections at a Queen Anne's county bus contractor's site, the lead VCA, Alfred Morgan, appeared and asked me where my vehicle was. I explained that I had taken my vehicle to a shop for maintenance and that I had ridden with VCA Washington. A short time later, my immediate supervisor, Chafin, appeared. Chafin loudly criticized me publicly for ridesharing with Washington.

31. The VID long had a practice of inspections typically being done in 2-person teams and had been flexible in allowing VCAs to travel together when one was having vehicle trouble.

32. No other VCAs or I ever previously had criticized when we had arranged ridesharing. On January 17th, I was acting consistently with the VID-condoned practice of VCAs arranging, without prior supervisory approval, ridesharing among ourselves.

33. I was upset by Chafin's publicly humiliating me. I distractedly and mistakenly completed my mileage log reflecting travel to Queen Anne's County on January 17, 2019.

34. Other VID VCAs had submitted mileage logs with similar mistakes on their mileage logs and suffered slight or no consequences for those actions.

35. On January 29, 2019, I injured my rotator cuff while at work and was unable to work from that date, until May 28, 2019. My injury was covered by Worker's Compensation.

36. The OCRFP, on February 28, 2019, issued its decision dismissing my internal EEO complaint. On March 13, 2019, I appealed that decision. On March 28, 2019, I had an interview with the EEOC, in Baltimore, Maryland regarding Charge No. 531-2019-00710.

37. On June 26, 2019, I was scheduled to perform low-priority random bus inspections and checks in Kent County. The previous day, I had done inspections at the Baltimore County Public Schools' school bus lot in Arbutus, Baltimore County. During those inspections, I had to remove (pull) tags from several Type B school buses that failed their Type B inspections. I pulled about ten tags that day. Gibson Decl. ¶  ; Gibson Dep. pp.  .

38. School buses whose tags were pulled could not be driven until the identified problems were corrected and they passed a re-inspection.

39. VID prioritizes resolving issues regarding pulled tags and restoring them to operators. Time is of the essence and, upon notification from the operator that the problem(s) were corrected, VCAs were expected to expeditiously conduct re-inspections. If the compliance issues were remediated, VCAs would return the tags to the operator.

Additionally, VID placed high priority on servicing those school systems that operated sizeable school bus fleets (Anne Arundel, Baltimore, Howard, County, Montgomery and Prince George's Counties) than on inspections in counties with smaller school bus fleets.

40. I promptly informed Bill Chafin of the pulled tags and reminded him that I was scheduled to do random Type B school bus inspections the following day in Kent County. Chafin directed me to return to the Arbutus bus lot on June 26, 2019, to re-inspect the school buses that had had their tags pulled for deficiencies and to perform random inspections in the Baltimore metropolitan area.

41. On June 26, 2019, as directed by Chafin, I returned to the Arbutus lot and completed the re-inspections. I also performed several random inspections in Howard and Carroll counties. Those duties consumed my entire work day. I did not travel to the Eastern Shore that day. After completing those inspections, I requested, and was approved for, 1.5 hours of sick leave.

42. Between June 24 and 26, 2019, my state vehicle was undergoing maintenance. I was using an MVA pool car. Consistent with MVA policies and practices, I accurately recorded my mileage on the MVA's mileage log and initialed my entries for June 24 and 25, 2019. I did not make any mileage log entries for June 26th.

43. Upon the completion of the maintenance on my state vehicle, Chafin met me at the MVA fleet lot to take me to pick up my vehicle. Consistent with MVA's policies and procedures, Chafin told me to leave the "red book" containing my mileage log in the pool vehicle. I did so. Leaving the mileage log in the pool vehicle was consistent with MVA's policies and practices. I never saw the mileage log subsequent to returning the

pool vehicle.

44. On July 16, 2019, I was working, doing inspections in Prince George's and Montgomery Counties. While I was driving, I noticed that I was being followed by a white Ford Focus. I tried to lose the car stalking me but was unable to do so. It got so bad that I could not do the rest of my inspections that I had scheduled that day. The car stalking made a lot of aggressive and dangerous maneuvers and was a threat to me and other drivers. After being stalked for about two hours, I got so scared that I called 911. I spoke to a dispatcher who told me to go to the closest Montgomery County Police Department station. I did so.

45. When I got to the police station, I spoke to an officer and filed a police report. While I was with the police officer, he called Groff on a speakerphone and told him that I was being stalked aggressively and dangerously by another vehicle. Groff denied having any knowledge of who might be stalking one of his employees.

46. I was so upset that I went home for the rest of the day on July 16, 2019. I reported the stalking incident to Groff and Chafin. He was unconcerned. Groff did not tell me that he had authorized and was well aware that I was under surveillance by Rob Thomas on July 16, 2019.

47. Sometime in July 2019, I was told that I was being investigated by the MVA for fraudulently reporting that I had traveled to the Eastern Shore on June 26, 2019 (despite MVA's knowledge that, at Chafin's direction, I had worked at the Arbutus school bus lot that day) and for forgery of my mileage log entry for that date. During that investigation, I denied falsifying my mileage log or any other MVA records regarding my work activities on June 26, 2019. I also never admitted submitting false inspection

reports for ostensible school bus inspections on the Eastern Shore on June 26, 2019.

48. On July 23, 2019, I was summoned to an investigatory interview with Rob Thomas. I appeared with my union representative, Tammie Booze (African American female). Another investigator briefly was present. He only stayed for a few minutes and was not there for most of the interview.

49. I never was placed under oath and there is no audio or video recording of the investigatory interview. I never signed anything. Thomas asked a lot of questions and handwrote my responses. I never was afforded the opportunity to review what Thomas had written down during the interview. Thomas had a pile of documents in front of him. The only documents that he showed me were the July 1, 2019, mileage log and my work manifest (schedule) for the week of June 24, 2019. Thomas never showed me any allegedly falsified inspections for June 26, 2019.

50. During the interrogation, Thomas used his size and demeanor to intimidate me. He repeatedly and abusively called me a liar, including screaming and pounding the table. Thomas' actions terrorized me so much that I was under extreme duress. In an effort to get through the ordeal, I gave Thomas answers that I thought were the responses that Thomas was demanding. Thomas screamed at me that he knew that I had falsified the June 26th entry on my mileage log. Thomas also accused me of falsifying inspections that I allegedly performed on June 26, 2019, in Kent County. I strongly denied that I had submitted false inspection reports and the mileage log. Thomas never showed me the allegedly falsified documents. I insisted that I never crossed the Chesapeake Bay Bridge on June 26, 2019. I repeatedly told Thomas that, at Chafin's direction, I had re-inspected the buses for which I had pulled tags the previous day and also had conducted

several other random inspections. Gibson Decl. ¶ ; Gibson Dep. pp. ; Tammie Booze, ¶ .

51. Thomas did not show me the inspection reports for the three inspections (other than the re-inspections at the Arbutus lot) that I did on June 26, 2019 – Tip Top Transportation, Woodbine, Maryland; Bauer Bus Service, Woodbine, Maryland; and Blue Horizons, Inc., Laurel, Maryland.

52. After I repeatedly denied falsifying documents, Thomas got really angry, screaming in my face, "you are a fucking liar." When Ms. Booze, the AFSCME Local 3655 representative, objected to Thomas' abusive treatment of me, Thomas repeatedly barked at Booze to shut up. During the interview, I told Thomas about the brutal abusive and discriminatory environment that I was experiencing in the VID. I never admitted to falsifying any documents during my interview with Thomas, or at any other time. I was under extreme distress during that interrogation.

53. After Thomas was done abusing me in the interrogation, I was extremely distraught, anxious, depressed and suicidal. That evening, I was really depressed and anxious when I received a text message from Hank Hollis, another Local 3655 representative. He was checking to see how I was doing after the Thomas interrogation. Hollis' text re-kindled my emotional distress from Thomas' abuse during the interrogation. I was in a hurry and distracted when I texted my response to Hollis. I did not proofread it before sending it to Hollis. In my response, I inaccurately summarized the meeting, texting that "[t]hey told me a falsified mileage log for my truck on January 17, 2019 and June 2019 and I did but it was a mistake with the mileage log then they got me on putting fake repair orders in the system. I did three." On January 17, 2019, like other VCAs also had done,

13

I had made a mistake in completing my mileage log for that day. I used the phrase "they got me" because that is what I interpreted Thomas to be telling me during the interrogation. My statement that "i did three" is accurate since I did three random inspections in Howard and Carroll Counties on June 26th.

54. On July 25, 2019, I was called into a meeting with Michael Groff and William Cole, another MVA supervisor. Ms. Booze was there representing me. Groff, without showing me any documents, accused me of violating several MVA policies, including falsifying documents. I strongly denied those accusations. I told Groff and Cole that I neither had falsified the mileage logs nor the school bus inspection reports. Groff and Cole also ignored my explanation that I had been in Baltimore, Howard and Carroll counties on June 26, 2019, with the approval of my supervisor. I saw Groff making handwritten notes on a piece of paper. He never showed me what he had written down. I never signed anything at that meeting.

55. Like the June 26, 2019 mileage log entry that was not in my handwriting, the inspection reports were uploaded into a database system that Groff had been instrumental in designing and implementing. Groff, the office administrator, Maribel Torres, and other managers had administrative rights to the vehicle inspection database and could create and edit inspection reports.

56. A mitigation meeting with Groff and Cole was held on July 26, 2019. This time, I was represented by Ms. Womble, the President of Local 3655. Ms. Womble stressed that I worked on the west side of the Bay Bridge on June 26, 2019, doing work at Chafin's direction and that management clearly had authorized all of my work activities that day. Ms. Womble also told Groff that, on July 1, 2019, he had approved the mileage

log. She also recounted the terrible history of abuse that I had experienced from state school bus contractors, local school system employees and my co-workers because of my gender and race, as well as Groff's long history of ignoring my reports and failing to provide me with any protection from that despicable abuse. Ms. Womble stressed that those actions placed me in fear of my life.

57. Ms. Womble accompanied me to a second mitigation conference on August 2, 2019, once again before Groff and Cole. Although Ms. Womble again stressed the points expressed during the other mitigation conference, Groff and Cole ignored Ms. Womble's mitigation arguments.

FURTHER AFFIANT SAYETH NAUGHT.

DATED:  JUNE 1, 2023.

_____
MASHELIA GIBSON