**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| MASHELIA GIBSON, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. 20-3220-BAH |
| MARYLAND MOTOR VEHICLE | * | |
| ADMINISTRATION, | * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

Plaintiff, Mashelia Gibson ("Plaintiff" or "Gibson"), brings the present action, in which she alleges the Defendant, the Maryland Motor Vehicle Administration ("Defendant" or "MVA") violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't ("SG") §§ 20-606(a), 20-606(f). Before the Court is a motion for summary judgment filed by Defendant, ECF 41, and three motions to strike. ECFs 50, 54, 58.[1] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023).

For the reasons stated below, Defendant's motion to strike, ECF 50, is **DENIED**, and Plaintiff's motions to strike, ECFs 54, 58, are **DENIED**. Defendant's motion for summary judgment as to all counts is **DENIED**.

---

[1] The Court references all filings by their respective ECF numbers. Specific page references correspond with the ECF-generated page numbers at the top of page.

## I.     BACKGROUND

Plaintiff is an African American woman who was employed by the MVA from January 4, 2017, until August 13, 2019.  ECF 1 (Complaint), at 2–3; ECF 7 (Answer), at 1.  She claims she experienced persistent and severe racial and sex-based harassment from her supervisors, co-workers, and from third parties throughout her employment.  ECF 1, at 3–13.  She also alleges that after she filed a discrimination complaint in 2018, her supervisor retaliated against her and conspired to frame and fire her.  ECF 1, at 9–11.

Plaintiff was the first and only female Vehicle Compliance Agent ("VCA") in the Vehicle Inspection Department ("VID").  ECF 1, at 3.  As a VCA, Plaintiff traveled across Maryland to conduct safety inspections of school buses.  ECF 48-1, at 1–2.  She worked with seven men, [2] two of whom were African American, four of whom were Caucasian, and one of whom was Asian, from Sri Lanka.[3]  ECF 48-1 (Gibson Declaration), at 1.  As the only African American woman VCA, she alleges she experienced mistreatment from her coworkers including being called "it" in front of clients by a Caucasian male coworker, ECF 48-1, at 3, being called "Whoopi Goldberg," ECF 41-8, at 19, being ridiculed for her hair, *id.*, being called "dumb," ECF 48-1, at 19, "[b]eing trained intentionally wrong," *id.*, and being told by one VCA that she needed to stop complaining

---

[2] The team consisted of two African American males, Lawrence Washington ("Washington") and Kenneth Garnett ("Garnett"); four Caucasian males, Alfred Morgan ("Morgan"), Erik Faatz ("Faatz"), Steve Brown, and Jeff Henieck; and one Asian male, Merennege Salgado ("Salgado"). ECF 48-1 (Gibson Declaration), at 2.

[3] The parties dispute the correct characterization of Salgado's race, with the MVA characterizing him as "Hispanic/Black" and the Plaintiff stating he is "Asian, from Sri Lanka." ECF 57-1, at 2–3; ECF 54, at 1.  Salgado self-identifies his race as "Asian, from Sri Lanka" in depositions, so that is the term the Court will use throughout.  ECF 48-4, at 3.

because they only had one other African American VCA before, and "if anyone deserved to get shot it was him," *id.*

Plaintiff alleges that her supervisors condoned this behavior and created a hostile work environment.  Plaintiff had two supervisors during her employment.  ECF 48-3, at 13–14.  The first, Michael Groff ("Groff"), supervised her throughout 2017 and 2018, and the second, William Chafin ("Chafin"), took over as Plaintiff's supervisor in early 2019 when Groff was elevated to be Plaintiff's second-level supervisor.  *Id.*  Plaintiff alleges that Groff condoned her co-workers' harassing and abusive behavior.  ECF 41-8, at 11.  She also claims that Groff on numerous occasions said she was the "first and only female that he would hire."  48-1 (Gibson Declaration), at 3; 41-8, at 11 (alleging "Mike Groff said on countless occasions that he had hired a woman and would never make that mistake again").  She further alleges that Groff told her that she and another African American VCA should not drive together to an inspection because it would "look strange." ECF 48-1 (Gibson Declaration), at 3.

In addition to mistreatment from co-workers and supervisors, Plaintiff alleges that as she performed her duties across the State of Maryland, she experienced racism and sex-based harassment, and that her supervisors failed to take her complaints seriously and failed to protect her from situations that endangered her after she informed them of the harassment.  ECF 48-1, at 3–5.

At school bus inspections throughout Maryland, Plaintiff describes a series of overtly racist and sometimes threatening incidents, including: (1) in August 2017, being called a "nappy-headed nigger" by a Caucasian male bus company owner, who permitted Confederate flags to adorn his buses; (2) in January 2018, being cut off by a driver in Calvert County while on MVA business who screamed, "Pull over, you black bitch," and swore, "Fuck you," and blew exhaust smoke into

her windshield; (3) in March 2018, she and VCA Lawrence Washington (an African American male) were conducting an inspection for Cecil County school bus owner Joseph Gilbert, who "pointed a six-foot bear taser" at her, "sicced" an "aggressive guard dog" on her, and pulled out a large snake when the two arrived to conduct a bus inspection, and Mr. Gilbert also said, "I only see two black people wearing all black" and that "around here we shoot first, ask questions later"; (4) in March 2018, at a different location in Cecil County, a school bus operator named Robert Dvorak (a Caucasian male) "released his mastiff guard dog, weighing more than 125 pounds" that lunged at her; (5) in August 2018, Plaintiff and VCA Garrett (an African American male) conducted an inspection in Carroll County and a school official said, "No one told us that you were black"; and (6) in September 2018, while in Harford County, Plaintiff asked a Caucasian male mechanic to use the restroom and was told "we don't have one for you" while he gestured to a "whites only" sign and provided a bucket to Plaintiff for her to urinate in.  *See* ECFs 48-1, at 3–5; 41-8 at 11–15; 48-3, at 27.

Plaintiff alleges that she complained about each of these incidents to Groff immediately after they occurred, but that he told her "you got to get used to seeing it", and that the school bus operators just needed to get used to her.  ECF 48-1, at 3; ECF 48-3, at 27.  She alleges a few incidents in which Groff purposefully sent her, alone, to an area of the state he knew she feared.  ECF 41-8, at 14 (describing one incident in which Groff sent all VCAs to southern Maryland but "saved the best for last" and was going to send Plaintiff to the Eastern Shore).  Gibson characterized the harassment as intending to "make tougher skin" and intending to make her "do the things that [she] say[s] scare [her]."  ECF 41-8, at 19

In November 2018, Plaintiff was informed that her privilege of using a state vehicle was suspended for three weeks, which she later discovered was the result of her incurring speeding

tickets and one incident where a prominent state official had reported that he saw Plaintiff's state vehicle being driven recklessly. ECF 48-1, at 6. MVA policy was to suspend VCA state-vehicle driving privileges after three speeding tickets. *Id.* at 6–7. Plaintiff had only two and did not yet know that a third party had reported her for reckless driving. ECF 48-1, at 6–7. Plaintiff feared that without a state vehicle, she would be placed more at risk in traveling to some parts of Maryland. *Id.*; ECF 41-8, at 17 (noting this incident caused her "a great deal of duress" and that her personal car was "vandalized during a few inspections"). She felt her suspension was another way in which she was being discriminated against. ECF 48-1, at 6–7. Plaintiff filed a federal EEOC complaint[4] and an internal complaint of discrimination with the Department of Transportation-MVA Office of Civil Rights and Fair Practices[5] ("OCRFP").[6] ECF 48-1, at 7. After the investigation began, Plaintiff alleges that in a meeting with Deborah Rodgers

---

[4] Plaintiff says she filed an EEO complaint on December 6, 2018, receiving Charge Number 531-2019-00710. ECF 48-1, at 7–8. Genice Fowler ("Fowler"), the lead EEO investigator for the Office of Civil Rights and Fair Practices who was assigned to her case, said that Plaintiff filed only an inquiry, and received a preliminary case number, but that she never formally submitted a case. ECF 41-10, at 7. This dispute is immaterial to the Court's analysis.

[5] The Maryland Department of Transportation ("MDOT") Office of Civil Rights and Fair Practices ("OCRFP") reviews internal complaints, and the determination of the Office is appealable to the Statewide EEO Coordinator, a unit within the Department of Budget and Management. ECF 41-6, at 49. This appeal procedure is governed by Title 5 of the State Persons & Pensions Article of the Maryland Annotated Code. *See* §§ 5-202(a) (creating a state EEO Program); 5-213 (governing appeals); 5-203 (noting this appeals process is an additional employment right and does not cut off an employee's right to pursue a complaint with the EEOC or the Maryland Commission of Civil Rights).

[6] The MVA explained that Plaintiff was suspended because Horatio Tablada, Deputy Secretary of the Department of the Environment, witnessed her driving recklessly and personally emailed Christine Nizer ("Nizer"), Administrator of the MVA. ECF 48-6. Nizer concluded this report was unbiased and credible, and treated it as the equivalent of a third speeding ticket. ECF 41-1 (Fowler Report), at 19.

("Rodgers") and Groff, Groff made statements acknowledging that Plaintiff had told him of the prior racist incidents in the past. *Id.* at 8 ("Rodgers was outraged and asked Groff why she was just hearing about it. Groff responded that he did not think that the reported incidents needed to be escalated.").

During the investigation of this internal complaint, Plaintiff alleges that Groff became angry and decided to retaliate against her by framing her for misconduct and firing her. ECF 42 (Plaintiff's response in opposition to Defendant's Motion), at 15. As evidence of a retaliatory motive, Plaintiff points to an email from January 2019, in which Groff asked Fowler about filing defamation charges against Plaintiff because her allegations were being discussed by everyone in the office and were creating an "unfavorable work environment." ECF 48-11 (Defamation email).

Around the same time, Plaintiff injured herself on the job and had to take leave for five months, from January 2019, until May 2019. ECF 48-1, at 9. When Plaintiff returned at the end of May, she alleges Groff acted swiftly to frame and fire her. *See* ECF 42, at 17–19.

Plaintiff was terminated on the basis of events that occurred on June 26, 2019, approximately one month after she returned from medical leave. ECF 48-1, at 9, 11–15. She was terminated for allegedly falsifying (1) bus inspection records and (2) vehicle mileage logs. ECF 41-6 (Charges of Termination), at 72–80; ECF 41-3 (Mileage Log), at 18; ECF 41-11, at 3; ECF 51-1 (Bus Inspections); ECF 41-11, at 3 (Business records custodian of bus inspections). Plaintiff denies falsifying the records. ECF 48-1, at 9–10.

On June 26, 2019, Plaintiff's state vehicle was receiving maintenance and she was using one of the MVA's pool cars. *Id.* at 10. The parties agree that she was scheduled to perform low priority random bus inspections in Kent County, along the Eastern Shore of Maryland. *Id.* at 10; ECF 41-7 (Work Schedule for the week of June 24 to June 28, 2019), at 82. The parties also agree

that Plaintiff did not go to Kent County that day.  ECF 48-1, at 10; ECF 41-1, at 3–6.  Plaintiff alleges that she was instructed by Chafin to deviate from the schedule and perform high priority re-inspections of buses in Baltimore County, and that she performed a few inspections in Howard and Carroll Counties, before she used her personal time to call out for the last hour and a half of that day.  ECF 48-1, at 10.

Plaintiff denies entering two bus inspections in Kent County on her inspection log but says she did enter three inspections from Howard and Carroll County.  ECF 48-1, at 11–12; ECF 48-3, at 48–49.  Defendant points to an automatically generated business record that shows when the inspections were entered into the system.  ECF 41-11.  Plaintiff denies entering these inspections and counters that Groff was instrumental in developing the bus inspection software and was able to create and edit bus inspection logs.  ECF 48-3, at 48–49.

Regarding the vehicle mileage logs, Plaintiff says that at the end of her day, consistent with pool car policies and Chafin's orders, she left her mileage log (in which she kept track of the distances she travelled for employment activities) in the pool vehicle, and she did not see it again and did not know who accessed it.  ECF 48-1, at 10–11.  Although there is a signature of her name next to the June 26, 2019, mileage log, she says the signature was forged, and the parties present competing handwriting experts on this point.  ECF 48-1, at 10; ECF 51-2 (Defendant's handwriting expert); ECF 48-21 (Plaintiff's handwriting expert).

The allegedly falsified records were discovered by Groff on June 27, 2019.  ECF 41-6 (Investigative Report), at 54.  Groff told the MVA's internal investigator, Rob Thomas, (a

Caucasian male) that he noticed a mileage discrepancy and that he then noticed that the time between bus inspections was too short to be accurate.[7]  *Id.*

Groff and Williams engaged in some preliminary investigation before elevating the matter to Paul Adams (a Caucasian man), their manager.  *See* ECF 41-5, at 55 (confirming follow up efforts prior to reporting suspicions).  Williams telephoned the school bus operators referenced on the report to confirm if they were present when a bus inspection was completed.  *Id.*  He contacted one individual, Kathy Hynson, who stated that she was home the entire day and that no inspection occurred, and Williams asked her to write a letter stating as such.[8]  *Id.*; ECF 41-5, at 10 (Hynson Letter).  In addition to contacting Ms. Hynson, Groff and Williams gathered paperwork and collected maps that showed what Plaintiff's mileage should have been and the amount of time it should have taken to travel between inspection sites, and Williams sent the documents and his suspicions to Paul Adams.  ECF 41-7, at 20.  Mr. Adams promptly forwarded the email to internal investigator Rob Thomas on July 1, 2019.  ECF 41-6, at 55.

Thomas began his investigation by speaking with Groff.  *Id.* at 54.  Thomas placed surveillance on Plaintiff, and investigators went to her home numerous times and followed her

---

[7] While Thomas did not include the time that Groff discovered the error on his report, by 10:55 a.m., Troy Williams (an African American male), from the Vehicle Safety and Compliance Division, was emailing inquiries seeking to get the transponder unit on Plaintiff's pool car from the prior day to confirm where she travelled, indicating that Groff discovered the discrepancies on the morning of June 27, 2019.  ECF 41-5, at 13.  Groff was carbon copied on this email.  *Id.*

[8] Ms. Hynson's letter, written on July 30, 2019, said the following:  "I am writing this letter to notify the MVA that on June 26, 2019 one of your inspectors falsely filed a completed bus inspection, but unfortunately the inspector never showed.  My Husband and I were present at the residence . . .  for most of the day.  It would be next to impossible for someone to come onto our property without our knowledge, considering that we were outside until 6 p.m.  I have spoken with Troy Williams Vehicle Safety and Compliance Special Assistant to the Director, and he has requested the previous events for your records."  ECF 41-5, at 10.

numerous times as she drove for work, presumably to see if they could catch her falsifying records.[9]  ECF 41-6, at 56–64.  During these times of surveillance, Groff played an active role. *See id.*  Once when the investigator lost Plaintiff's trail, Thomas called Groff and asked him to help the investigator find her.  *See id.* at 56.  Groff complied and made phone calls to get the address of where Plaintiff was located, and promptly relayed that information to Thomas.  *Id.* at 56–57.  Groff also advised Thomas that July 16, 2019, would be the best day to surveil Plaintiff, and Thomas concurred and complied.  *Id.* at 60.

During surveillance on July 16, 2019,[10] Plaintiff, unaware of the surveillance, noticed a car following her, and after two hours of trying to evade the car, she called 911 and drove to the nearest Montgomery County police station to report being stalked.  ECF 48-1, at 11.  She called Groff to report being stalked and explain her inability to complete her assigned inspections.  *Id.* Immediately after Groff got off the phone with Plaintiff, he called Thomas to inform him that Plaintiff had seen Thomas's investigator.  ECF 41-6, at 63.  Groff told Thomas that he "did not provide Gibson with any information pertaining to [her] investigation" and did not say anything to Plaintiff about why she was being followed.  *Id.*  Thomas's investigative record contains frequent mention of Groff and even suggests Thomas would report his findings and updates to Groff and Williams.  *See* ECF 41-6, at 54–66.

---

[9] The record does not reveal whether this surveillance was normal or proportionate to the allegations; however, the record does reveal that no other employee in the school bus inspection unit was ever accused of or found guilty of falsifying documents.  ECF 41-6, at 85 (email communication between Manager of Employee Relations Unit and Genice Fowler, Lead EEO investigator for the OCRFP).

[10] During the July 16, 2019, surveillance both Rob Thomas and another investigator, John Poliks, surveilled Plaintiff.  *See* ECF 41-6, at 61.

On July 23, 2019, Thomas conducted an investigatory interview with Plaintiff, one of Plaintiff's union representatives, Tammie Booze ("Booze"), and Paul Adams. *See* ECF 48-1 (Gibson Declaration), at 12; ECF 55-2 (Booze Declaration); ECF 41-9 (Thomas Declaration); 51-3 (Adams Declaration). The parties dispute what happened in that interview, including whether Thomas physically intimidated Plaintiff, who was in attendance and for how long, and whether Plaintiff admitted to falsifying any documents. ECFs 48-1, 55-2, 41-9, 51-3. The parties also dispute whether Plaintiff's text messages, sent to another union representative after the meeting, constitute an admission. ECF 48-29 (text messages).

Two mitigation conferences were held. The first was held on July 25, 2019, with Groff, William Cole ("Cole")[11], Plaintiff, and another union representative, Mildred Womble ("Womble"), President of Plaintiff's union. *See* ECF 41-3, at 20 (Notice of Mitigation Conference); ECF 41-3, at 14–15 (Groff's and Cole's typed notes from the interview); ECF 48-10 (Womble Declaration); ECF 48-1, at 14–15.

The second mitigation conference occurred on August 2, 2019, again with Groff, Cole, Plaintiff, and Womble. ECF 48-10, at 3–4. Womble represented the mitigating circumstances of Plaintiff's past harassment and abuse and her fear of traveling to certain counties. ECF 48-10, at 3. Womble also stated that she had previously had discussions with the MVA Administrator, Christine Nizer ("Nizer"), who confirmed Plaintiff would not be required to work in the Eastern Shore of Maryland. *Id.* at 4. Womble testified that management was nevertheless sending Plaintiff to "counties where she had been threatened." *Id.* at 3–4. Furthermore, Womble described these meetings as aggressive and accusatory, and said that in her experience investigators tended to be

---

[11] The parties do not identify William Cole's role or responsibility in these mitigation conferences.

nicer to non-African Americans when compared to African Americans.  ECF 48-10 (Womble Declaration), at 4 (describing the difference in treatment between Plaintiff and fellow VCA Merennege Salgado during such interviews).[12]

Plaintiff received notice of her immediate suspension pending resolution of termination charges on August 13, 2019.  ECF 41-3, at 6.  Plaintiff was terminated on August 14, 2019, with final authorization given by Nizer.  ECF 41-1, at 3.  On August 28, 2019, Plaintiff appealed the MVA's termination decision.  ECF 1 ¶ 49.[13]

Subsequently, Plaintiff dual-filed the administrative complaint that forms the basis of this case in December 2019 with the Maryland Commission on Civil Rights ("MCCR") and Equal Employment Opportunity Commission ("EEOC").  ECF 41-5, at 4.  On August 5, 2020, the EEOC Investigator closed Plaintiff's EEOC file and issued Plaintiff a right to sue within 90 days of receipt of her notice.  ECF 41-5, at 2.  Plaintiff timely filed suit in this Court on November 5, 2020.  ECF 1 (Complaint).

Discovery was completed on March 15, 2019. ECF 38. The motion is fully briefed, and ripe for resolution.

---

[12] Merennege Salgado ("Salgado") was the only other VCA that the parties identify as having received disciplinary action during the relevant timeframe.  He received a five-day suspension after an investigation sustained allegations that he operated a wholesale car business in violation of the MVA's conflict of interest policies, conducted private business such as attending auctions for his private business during the workday and lied about doing so to investigators.  *See* ECFs 48-30–48-40.

[13] Plaintiff later, through counsel, withdrew her termination appeal from the Office of Administrative Hearings.  ECF 41-6, at 82.

## II.   LEGAL STANDARDS

When presented with a motion to dismiss or, in the alternative, a motion for summary judgement, the disposition of the motion "implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure."  *Pevia v. Hogan*, 443 F. Supp. 3d 612, 625 (D. Md. 2020).  "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).

In this case, Defendant's Motion is styled as a "motion to dismiss, for judgment on the pleadings, and/or for summary judgment."  ECF 41-1, at 1.  Both parties have provided hundreds of pages of exhibits and the parties have been given a reasonable opportunity to present material pertinent to the Motion, as evidenced by Defendant's clear captioning of the motion and as evidenced by the Plaintiff's opposition to Defendant's Motion.  *See* ECFs 41-1, 42.  Thus, the Court exercises its discretion to evaluate Defendant's Motion as a motion for summary judgment.

### A.   Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists."  *Progressive Am. Ins. Co. v. Jireh*

*House, Inc.*, 603 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins.*

*Co.*, 603 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

### B.      Summary Judgment in the Title VII Context

A plaintiff in an employment discrimination case is entitled to *de novo* review in the district court.  *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996).  However, *de novo* review does not give the court *carte blanche*.  A federal court "may only consider those allegations included in the EEOC charge," *Balas v. Huntington Ingalls Industries, Inc.*, 711 F.3d 401, 407 (4th Cir. 2013), and those that "can reasonably be expected to follow the charge of discrimination."  *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981); *see also Evans*, 80 F.3d at 963.

Constrained by the scope of the EEOC charge and subsequent investigation, a plaintiff may meet her summary judgment burden of establishing a genuine dispute of material fact either by offering direct or circumstantial evidence, or by proceeding under the scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *Evans*, 80 F.3d at 959.  *McDonnell Douglas* sets out a three-step scheme in which the plaintiff bears the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence.  *Id.*  If the plaintiff meets this burden, the defendant-employer can rebut the presumption of discrimination by presenting evidence of a legitimate, non-discriminatory reason for its employment actions.  *Id.*  If the defendant-employer provides this reason, the presumption of discrimination "drops out of the picture" and the burden shifts back to the plaintiff to demonstrate that the defendant's rationale is pretextual.  *Id.*  At bottom, the "plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her."  *Id.* (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

In considering the ultimate question of pretext, the Fourth Circuit has repeatedly cautioned district courts to "take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue." *Evans*, 80 F.3d at 958–59 (citing *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir 1987)). Nevertheless, "summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." *Id.* at 958–59.

### C.      Maryland Fair Employment Practices Act

The Maryland Fair Employment Practices Act ("MFEPA") prohibits discriminatory employment practices based on an individual's protected characteristics, including one's race and sex within the State of Maryland. Md. Code Ann. State Gov't ("SG") § 20-606 (2021). The Supreme Court of Maryland has recognized that MFEPA is "modeled on federal anti-discrimination legislation." *Doe v. Catholic Relief Servs.*, 300 A.3d 116, 126 (Md. 2023) (quoting *Molesworth v. Brandon*, 672 A.2d 609, 614 (Md. 1996)). Maryland has a well-established "history of consulting federal precedent in the equal employment area." *Taylor v. Giant of Md.*, LLC, 33 A.3d 445, 459 (Md. 2011) (citing *Haas v. Lockheed Martin Corp.*, 914 A.2d 735 (Md. 2007)). For instance, Maryland follows the burden-shifting framework set out in *McDonnell Douglas Corp.*, 411 U.S. at 792, when resolving a claim of retaliation and employment discrimination. *Lockhead Martin Corp. v. Balderrama*, 134 A.3d 398 (Md. App. 2016); *Edgewood Mgmt. Corp. v. Jackson*, 66 A.3d 1152 (Md. App. 2013). As such, the Court's analysis under Title VII and MFEPA, unless otherwise indicated, will be the same.

## III.     ANALYSIS

The parties present numerous motions that the Court consolidates below. Before delving into the substance of Defendant's motion for summary judgment ("Defendant's Motion"), the

Court addresses three preliminary motions to strike related to Defendant's Motion. For the reasons stated below, both parties' motions to strike are denied, *see infra* Section A, and Defendant's motion for summary judgment is denied as to all counts. *See infra* Section B.

### A.    Motions to Strike

Rule 12(f) of the Federal Rules of Civil Procedure permits a court to "strike from any pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Both parties have submitted motions to strike. *See* ECF 50 (Defendant's Motion); ECF 54 (Plaintiff's Motion to Strike statements in ECF 51); ECF 58 (Plaintiff's Motion to Strike Defendant's Reply of ECF 56).

A motion to strike is viewed with disfavor "because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) (internal citations and quotations omitted). Additionally, motions, memoranda, and the exhibits attached to them are not pleadings subject to a motion to strike. *Tepeyac v. Montgomery Cnty.*, 779 F. Supp. 2d 456, 460 (D. Md. 2011), *rev'd in part on other grounds*, 683 F.3d 591 (4th Cir. 2013), *aff'd on reh'g en banc sub nom.*, *Centro Tepeyac v. Montgomery Cnty.*, 772 F.3d 184 (4th Cir. 2013).

Defendant's motion to strike, ECF 50, relates to an unsigned declaration of a witness, Tammie Booze, that Plaintiff attached to her opposition to Defendant's motion for summary judgment. ECF 48-28, at 2. However, after Defendant filed this motion to strike, Plaintiff withdrew the exhibit. ECF 52. In opposition to the Defendant's motion to strike, *see* ECF 53,

Plaintiff noted the Defendant's motion was mooted.[14]   ECF 53, at 1.   The Court agrees and Defendant's motion to is hereby **DENIED**.

Additionally, Plaintiff submits two motions to strike.   ECFs 54, 58.   First, Plaintiff asks the Court to strike parts of the Defendant's reply memorandum of law, ECF 51, in support of the Defendant's motion for summary judgment.   ECF 54, at 1.   Specifically, Plaintiff alleges Defendant's reply memorandum mischaracterizes the alleged comparator's race, submits an unauthenticated exhibit that was not produced in discovery, and erroneously argues Plaintiff is incompetent to testify about her medical conditions.   ECF 54, at 1–2.

However, as noted above, "motions, memoranda, and the exhibits attached to them are not pleadings subject to a motion to strike."   *Tepeyac*, 779 F. Supp. 2d at 460; *see also McClarigan v. Riverside Hosp., Inc.*, No. 4:21-CV-148, 2022 WL 3588031, at *2 (E.D. Va. Aug. 22, 2022) (holding exhibits attached to memorandum in opposition to a motion to dismiss are not "pleadings"); *CX Reinsurance Co. Ltd. v. Johnson*, 325 F.R.D. 132, 135 (D. Md. 2018) ("A motion for summary judgment is not a pleading and therefore is not susceptible to a motion to strike."); *see also* Fed. R. Civ. P. Rule 7 (defining pleadings).   As Plaintiff's motion to strike relates only to characterizations and exhibits within Defendant's motion for summary judgment, Plaintiff's motion to strike, ECF 54, is hereby **DENIED**.

_____

[14] Plaintiff's counsel explained he had numerous conversations with Ms. Booze, but that as a union representative her affidavit had to be cleared by her union's counsel.   ECF 53, at 2.   Plaintiff discovered that Ms. Booze was on bereavement leave and Plaintiff submitted the unsigned document "to be supplemented with the declaration executed by Ms. Booze upon her return from bereavement leave."   *Id.*   In ECF 55, Plaintiff resubmits Ms. Booze's affidavit, now with a signature, ECF 55-2, at 2, yet issues an erratum that corrects the substance of Ms. Booze's affidavit. ECF 55 at 2–3 (replacing detailed observations from an investigatory interview with general statements that Plaintiff was treated differently from the alleged comparator).

Plaintiff's second motion to strike, ECF 58, asks the Court to strike Defendant's reply memorandum, ECF 56, which was a reply in response to Defendant's motion to strike the declaration of Ms. Booze.  ECF 58, at 2.  Plaintiff argues the reply was filed one day late according to Local Rule 105.2.a., which requires reply memorandum be filed fourteen days from service of an opposition.  *Id.*  This motion is mooted because the Court denies Defendant's motion to strike, ECF 56, as moot.  *See supra.*  Plaintiff's motion to strike Defendant's reply memorandum, ECF 58, is hereby **DENIED**.

## B. Motion for Summary Judgment

As an initial matter, Defendant presents two procedural arguments.  First, Defendant argues the Court lacks jurisdiction over Plaintiff's discrimination and retaliation claims under Title VII due to Plaintiff's failure to exhaust her administrative remedies.   ECF 41-1, at 29–31.  Second, Defendant argues Plaintiff's state law claims are time barred.  *Id.* at 31–34.

As to the exhaustion argument, the Court notes exhaustion requirements are not of "jurisdictional cast" and instead, are akin to a claims processing rule that can be waived if not properly raised.  *Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1851 (2019).  To the best of the Court's understanding,[15] Defendant argues that Plaintiff is precluded from bringing any claims connected

---

[15] Defendant's arguments on this point are imprecise and vague.  It is the responsibility of the party raising an argument to formulate arguments, and the Court bears no responsibility to flesh out an unexplained argument on a party's behalf.  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (noting it is "not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones"); *Clayton v. Nationwide Mut. Ins. Co.*, 260 F. Supp. 3d 514, 521 (D.S.C. 2017) ("The court has no obligation to fashion arguments for a party or to further develop a party's argument when it is wholly conclusory, unexplained, and unadorned with citation to legal authority."); *Tymar Distribution LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275, 1289 n.7 (S.D. Fla. 2021) ("The onus is upon the parties to formulate arguments." (citation omitted)).  The Court nevertheless construes Defendant's argument as asserting that the 2018 claims cannot form the basis of the present complaint due to a lack of exhaustion.

to her 2018 complaint because she did not appeal the final decision of the Statewide EEO Coordinator, Glynis Watford, to the MCCR or EEOC.  ECF 41-1, at 31; ECF 51, at 11–12.  In other words, Defendant argues that because a plaintiff must first satisfy state administrative exhaustion procedures through a state deferral agency, plaintiff failed to exhaust her administrative procedures because she didn't follow through with her appeal to the correct agency, the MCCR. *See* 42 U.S.C. § 2000e-5(c) (requiring state administrative exhaustion for deferral states, such as Maryland).[16]

Defendant cites no caselaw on whether the Statewide EEO Coordinator's determination satisfies Title VII's state administrative exhaustion requirement.[17]  ECF 51, at 11–12.  The Defendant does not cite any applicable statute, nor does Defendant provide a rule of law articulating how a court is to determine which state agencies may make state deferral determinations.  ECF 41-1; ECF 51.  While this is an interesting question, the Court need not wade into it because the 2018 complaint alone would not prevail on the merits.[18]

---

[16] The Court notes that Defendant's argument is largely raised in reply.  Ordinarily, arguments raised for the first time in reply will be construed as waived.  ECF 51, at 11–12.  *See Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 602 n.13 (4th Cir. 2013); *McBurney v. Young*, 667 F.3d 454, 470 (4th Cir. 2012); *Carter v. Lee*, 283 F.2d 240, 252 n.11 (4th Cir. 2002).  The reason for this is that the "purpose for having a motion, response and reply is to give the movant the final opportunity to be heard and to rebut *the non-movant's response*." *Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utils.*, 410 F. Supp. 3d 943, 949 (S.D. Ind. 2019) (emphasis added) (citation omitted).  A spontaneously raised argument in reply deprives the nonmovant of the opportunity to substantively respond to the points raised by the movant and deprives the Court of the benefit of adversarial analysis on a particular issue.  *Id.*  The Court will nevertheless address this argument, given the mention of exhaustion in Defendant's Motion, even though Defendant did not flesh out the argument until its reply.  *See* ECF 41-1, at 29–31.

[17] Additionally, the parties do not address whether Plaintiff's initiation of a 2019 MCCR complaint satisfies the state-deferral requirements of 42 U.S.C. § 2000e-5-(c).

[18] Plaintiff's Counts I and IV mention the 2018 suspension of state driving privileges.  ECF 1 ¶¶ 62, 88.  The Court construes these counts to be alleging a series of discriminatory acts that include

Plaintiff's 2018 complaint alleged discrimination based on her three-week suspension from state vehicle driving privileges. ECF 41-4, at 13–14. Even if Plaintiff's 2018 allegations could establish a prima facie case of race and sex discrimination, the Defendant supplied a legitimate, non-retaliatory rationale that Plaintiff never rebuts. *See McDonnell Douglas Corp.*, 411 U.S. at 802 (outlining three-step framework for analyzing claims under Title VII). Defendant provides email communications showing that a third-party witness independently contacted MVA Administrator, Christine Nizer, to report that an MVA driver was driving recklessly. *See* ECF 41-4, at 19. Plaintiff provided no evidence to show her suspension was pretextual. Furthermore, the third party who reported her, Horatio Tablada, the Deputy Secretary of the Maryland Department of the Environment did not see the race or sex of the driver so it is unlikely Plaintiff can even establish that the adverse action was taken because of her race or sex. *See id.*

The Court instead views the events complained of prior to and during the 2018 complaint process as relevant background information, because Plaintiff's 2018 complaint is a necessary part of the narrative in Plaintiff's 2019 retaliation complaint. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Also, the Court is presently reviewing Plaintiff's 2019 complaint[19] filed with both the EEOC and MCCR, and the 2018 complaint is relevant background

_____

far more than simply one incident of suspended driving privileges. Nevertheless, given the ambiguity on this point, the Court addresses the insufficiency of a standalone claim above.

[19] Plaintiff's 2019 MCCR appeal terminated when Plaintiff voluntarily withdrew her appeal from the Office of Administrative Hearings. ECF 41-6, at 82. Ordinarily a voluntary dismissal of a state deferral agency's appeal cannot serve as the basis for administrative exhaustion. *See Sekaquaptewa v. Burkeholder*, 163 F.3d 607 (9th Cir. 1998); *Bowers v. Nicholson*, 271 F. App'x 446 (5th Cir. 2008); *Slingland v. Donahoe*, 542 F. App'x 189, 192 (3d Cir. 2013). However, Defendant has not raised this argument; rather, Defendant asks this Court to do the opposite and treat the abandonment of her rights to an administrative hearing as a "final decision" regarding her termination. ECF 51, at 12. Defendant does not address whether a "final decision" of this variety would satisfy exhaustion requirements and permit federal review. ECF 51, at 11–12. As the

information as to the 2019 complaint.  *Id.* at 113 (noting Title VII does not bar "an employee from using the prior acts [that otherwise would be barred] as background evidence in support of a timely claim"); *see* ECF 41-5, at 2–4 (EEOC right to sue letter for the 2019 complaint).

Next, Defendant argues Plaintiff's state law claims should all be dismissed as time barred.[20] ECF 41-1, at 31–33.  Defendant argues that the events Plaintiff complains of are too remote in time to be considered as acts that form the basis of this case.  *See id.*  A bit of background on MFEPA is necessary to address this argument.

MFEPA gives a complainant the right to bring a civil action on her own behalf.  SG § 20-1013.  This is allowed when complaining of an unlawful employment practice if: (1) the complainant "initially filed a timely administrative charge or complaint under federal [or] State … law alleging an unlawful employment practice by the respondent"; (2) at least 180 days have elapsed since the filing of the administrative complaint; and (3) the civil action is filed within two years of the unlawful employment practice (or three years for harassment claims).  SG § 20-1013 (a)(1)(i)-(iii).  As the Court understands it, Defendant is arguing that Plaintiff cannot satisfy this first element for a timely original administrative charge.

---

exhaustion requirements under Title VII can be waived if not properly raised, the Court must conclude Defendant waived contesting the MCCR appeal serving as the prerequisite to the present federal civil action by affirmatively arguing that it be treated as a "final decision." ECF 51, at 11–12.  Additionally, the Defendant failed to properly raise arguments as to Plaintiff's 2018 administrative appeal with the OCRFP by relying upon only conclusive statements without citations to authority.  *See id.*

[20] Defendant made no argument concerning the timeliness of Plaintiff's claims under Title VII. ECF 41-1, at 31–35.  Any such claims are waived.  *See Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1849 (2019) (noting Title VII's charge-filing requirement outlined in 42 U.S.C. 2000e-5(e)-(f) is not jurisdictional; rather, it is a claim-processing rule similar to statues of limitations that can be waived if not raised).

In this case, Plaintiff dual filed a complaint with the MCCR and EEOC in December 2019.[21]  *See* ECF 41-5, at 4.  When complaining of unlawful employment practices, an administrative complaint is timely that is filed with the MCCR within 300 days of the discriminatory act.  SG § 20-1004(c)(2).  However, when alleging *harassment* against an employer, a complaint is timely if it is filed within two years after the date on which the alleged harassment occurred.  SG § 20-1004(c)(3) (emphasis added).

Defendant says Plaintiff's allegations were for events that occurred in March 2018 or earlier and, as such, she had to file an administrative complaint by September 2018.  ECF 41-1, at 33.  Notwithstanding the fact that Plaintiff presented evidence that there were incidents after March 2018,[22] MFEPA provides longer timelines than 180 days.  *See* SG § 20-1004(c)(2) (extending the deadline to 300-days for unlawful employment practices that do not involve harassment, and two years for harassment-based claims).[23]  Defendant cites no authority and presents no argument as to why the persistent race and sex-based incidents from coworkers, supervisors, and third parties do not qualify as harassment.  ECF 51, at 13–14.  Defendant merely quotes Plaintiffs deposition and declaration and states in a conclusory fashion that her claims are not harassment claims.  *Id.*

---

[21] In Plaintiff's response, she represents that the complaint was filed on December 2, 2019.  ECF 42, at 38 n.58.  The complaint filed as part of the record indicates Plaintiff e-signed the complaint on November 28, 2019.  ECF 41-5, at 4.  This difference is immaterial for the Court's analysis, and because the MVA does not challenge Plaintiff's representation, the Court will use the December 2, 2019, date.

[22] *See, e.g.*, ECFs 48-1, at 3–5; 41-8, at 11–15 (alleging, for instance, an incident with a Carroll County school board representative named Kim in April 2018, and alleging the "whites only" bathroom incident occurred on September 26, 2018).

[23] If the Court construed her claims as non-harassment based, Plaintiff would have had until July 23, 2019, to file; if the Court considers them harassment claims, she would have until September 26, 2020 to file.  Plaintiff filed her 2019 EEOC complaint in December 2019.

Additionally, Maryland law recognizes the continuing violation doctrine; thus, as long as one event in a series of related offenses occurs within the statutory timeline, the earlier-in-time offenses may still be considered timely.  *Prince of Peace Lutheran Church v. Linklater*, 28 A.3d 1171, 1189 (Md. 2011); *Bacon v. Arey*, 40 A.3d 435, 465 (Md. App. 2012) ("This Court and the [Supreme Court of Maryland] have recognized the continuing harm or continuous violation doctrine, which tolls the statute of limitations in cases where there are continuous violations. Under this theory, violations that are continuing in nature are not barred by the statute of limitations merely because one or more of them occurred earlier in time. . . .").  The Supreme Court of Maryland has adopted an even more expansive view, construing harassing conduct outside the two-year statute of limitations as sufficiently connected to retaliatory conduct within the statute of limitations.  *Linklater*, 28 A.3d at 1189.

Plaintiff's allegations are facially based on ongoing harassment, and thus, the two-year statute of limitation applies.  *See id.* (applying the two-year statute of limitations to a similar factual scenario).  After a review of the record, and the parties' arguments on this point, the Court is satisfied that all of Plaintiff's state law claims were timely presented in her 2019 complaint.  ECF 41-5, at 1–2.

Proceeding to Defendant's substantive arguments, Defendant asks the Court to dismiss Count II and Count V (retaliation) under Title VII and MFEPA, Count I and Count IV (race and sex discrimination) under Title VII and MFEPA, and Count III and Count VI (hostile work environment) under Title VII and MFEPA.  ECF 41-1.  For the reasons stated below, Defendant's motion for summary judgment as to all counts is **DENIED**.

### 1.   Retaliation Under Title VII and MFEPA

*i.*      *Plaintiff has Established a Prima Facie Claim of Retaliation.*

To establish a prima facie case of retaliation under both Title VII and MFEPA, a plaintiff must show: "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Strothers*, 895 F.3d at 327–28; *see also Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008); *McDonnell Douglas Corp*, 411 U.S. at 792. Defendant only contests the third element, causation. *See* ECF 41-1, at 22.[24]

"[E]stablishing a causal relationship at the prima facie stage is not an onerous burden." *Strothers*, 895 F.3d at 335 (internal citation and quotation marks omitted); *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012) ("[V]ery little evidence of a causal connection is required to establish a prima facie case of retaliation." (citation omitted)). Whereas at the pretext stage a plaintiff must show her protected activity was the "but-for" cause, or the "real reason" for her adverse employment action, at the prima facie stage, the plaintiff need not make this showing. *Strothers*, 895 F.3d at 335. Plaintiff can establish prima facie causation simply by showing that the Defendant knew or should have known about Plaintiff's prior EEOC filing, and that the Defendant terminated her soon after becoming aware of such activities. *Strothers*, 895 F.3d at 336 (citing *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994)); *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989). The parties do not dispute that Defendant was aware of

---

[24] Defendant does not provide argument as to prima facie causation, however, and only addresses causation under the pretext step of the *McDonnell Douglas* framework. *See id.* at 22, 25–26. While it is Plaintiff's burden to clear this first hurdle, the burden on Plaintiff differs when causation is analyzed at the prima facie stage and the pretext stage. *Strothers*, 895 F.3d at 335; *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250–51 (4th Cir. 2015). Nevertheless, to the extent possible, the Court considers Defendant's pretext causation arguments at this stage as well.

Plaintiff's December 2018 EEOC filing.  ECF 41-1, 23–25.  The focus of the parties' dispute is on whether the Court can infer causation based on the temporal connection between Plaintiff's 2018 EEOC complaint and Plaintiff's termination.

Courts are more likely to find a causal connection when little to no time has elapsed between a plaintiff engaging in a protected action and a plaintiff experiencing an adverse employment action.  *Compare Strothers*, 895 F.3d at 336 (holding one day between notification of intent to file a grievance and the employee's termination satisfied the causal connection requirement at the prima facie stage) *and Carter*, 33 F.3d at 460 (finding prima facie causation where employer fired plaintiff four months after discrimination complaint was filed), *with Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (holding a three year lapse between protected activity and adverse employment action was too lengthy to establish a causal nexus) *and Clark v. Chrysler Corp.*, 673 F.2d 921, 930 (7th Cir. 1982) (holding two-year lapse negated inference of causation).

Defendant argues the proximity between these events must be "very close," *i.e.*, within a 3-to-4-month period.  ECF 41-1, at 25 (citing *Clark Cnty. School Dist. v. Breeden*, 522 U.S. 268, 273 (2001)).  Defendant points out that Plaintiff's internal complaint, filed on December 7, 2018, and her termination on August 4, 2019, were nearly nine months apart.  ECF 41-1, at 25.  Defendant asserts this is "simply too long to create an inference of causation."  *Id.*

Plaintiff counters that the causal inference between a protected activity and adverse employment action is not lost where the employer implements an adverse action at the "first opportunity."  ECF 42, at 33.  Plaintiff highlights that she filed her charge in December 2018, her supervisor Groff contemplated suing her for defamation in January 2019 based on that charge, and then Plaintiff was on medical leave due to a workplace injury until May 28, 2019.  ECF 48-1, at

9.  Only one month after returning from medical leave, on June 26, 2019, Plaintiff was, according to her, framed for falsifying record logs.  ECF 1, at 9–11.  Within a week, she was under formal investigation, and within another month, she was terminated.  *See* ECF 41-6, at 53 (documenting formal investigation began on July 1, 2019); ECF 41-1 (noting Plaintiff's termination on August 14, 2019).  The total time between Plaintiff's complaint and her termination, excluding the period she was out of work on medical leave, was approximately two and a half to three months.  This would be within the "very close" proximity guidelines Defendant pointed to from *Clark County School District v. Breeden*.

Plaintiff persuasively cites other cases in which courts relied on the "first opportunity" doctrine to find a causal connection in circumstances that otherwise may be too temporally disconnected.  ECF 42, at 27 (citing *Reardon v. Herring*, 201 F. Supp. 3d 782, 786 (E.D. Va. 2016) (discussing Fourth Circuit's approach that an expression of animus plus subsequent retaliation at first opportunity can establish a prima facie case of retaliation at the motion to dismiss stage); *Murphy-Taylor v. Hoffmann*, 968 F. Supp. 2d 693, 721–22 (D. Md. 2013) (finding causal connection with a 51-month delay between protected activity and adverse action); *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650–51 (4th Cir. 2007)).  There exists much support within this circuit and other circuits on this point.  *Templeton v. First Tenn. Bank*, *N.A.*, 424 F. App'x 249, 251 (4th Cir. 2011) (per curiam) (holding district court erred in dismissing retaliation claim when the plaintiff alleged retaliation at the employer's first opportunity to do so, even when two years elapsed between the protected activity and adverse employment decision, a failure to rehire); *see also Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) (assuming without deciding that in the failure to hire context, knowledge plus an adverse action taken at the first opportunity satisfies the causal connection element of a prima facie case).

Although many of the cases featuring exceedingly long delays arise within the failure-to-hire context, that need not confine the application of this principle to such cases.  *See Johnson v. Scott Clark Honda*, Civ. No. 3:13–485–RJC–DCK, 2014 WL 1654128, at *4 (W.D.N.C. Apr. 25, 2014), *aff'd*, 584 F. App'x 180 (4th Cir. 2014) (applying "first opportunity" doctrine to employee's request to become a full-time employee).  The rationale underlying the first opportunity doctrine is based on the simple inference that those motivated by retaliatory animus will likely enact their retaliation quickly.  *McGuire v. City of Springfield*, 280 F.3d 794, 796 (7th Cir. 2002).  However, that reason "does not apply" when "the employer had no earlier opportunity to retaliate."  *Id.* (holding that although a ten-year delay between protected activity and the adverse employment action "was exceedingly long[,] . . . the reason a long wait often implies no causation . . . d[id] not apply" because the employer had no earlier opportunity to retaliate).  If a ten-year delay, like the one at issue in *McGuire*, need not defeat a Plaintiff's prima facie causal showing, the Court sees no reason it should do so over a nine-month period, when Defendant similarly acted at the "first opportunity" according to Plaintiff, by purportedly framing her within one month of her return to work and firing her within two months of her return to work.  The Court finds Plaintiff has established prima facie causation, and therefore, has established a prima facie claim for retaliation under Title VII and MFEPA.

*ii.*    *Defendant Provides a Legitimate, Nonretaliatory Reason for Plaintiff's Termination.*

As Plaintiff has satisfied her initial burden to demonstrate a prima facie case of retaliation, the burden flips to Defendant to produce a legitimate, nonretaliatory reason for the adverse employment action.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  In this case, Defendant provided evidence that Plaintiff falsified mileage logs and bus inspections on June 26, 2019.  ECF 41-6 (Thomas Report); ECF 51-1 (Bus Inspections); ECF 41-11 (Business Record Affidavit).

Defendant provides Plaintiff's work schedule for June 26, 2019, ECF 41-7, at 82, which stated she was assigned to conduct "Low % County Random Inspection" in Kent County, and Plaintiff's mileage log that stated she traveled from her home to Kent County and back home that day.  ECF 48-20, at 1.  Plaintiff's mileage log indicated she self-reported travelling 18 miles that day despite the total miles she would have had to travel being 104 miles based on her work schedule.  *Id.*; ECF 41-6, at 53.  The investigative report included a computer search of the route Plaintiff would have had to travel if she really did go to Kent County.  *Id.*  Finally, Defendant provides Plaintiff's bus inspection record and an affidavit of the business record custodian affirming that Plaintiff was the individual to mark the inspections as completed.  ECF 51-1; ECF 41-11.  Defendant has also shown that falsification of these records is an offense that is prohibited and could warrant termination.  ECF 41-6, at 74.  Plaintiff was terminated on August 14, 2019, for violating COMAR 11.02.08.06B that prohibits providing a false official statement or report.  *Id.*  Therefore, Defendant has satisfied the burden of production by providing a facially legitimate rationale for Plaintiff's termination.

> *iii.*   *Plaintiff has Created a Genuine Dispute Over Whether Plaintiff's Protected Activity was a But-for Cause of her Termination.*

At this stage, the presumption of discrimination falls away, and Plaintiff again bears the burden to show retaliatory animus was "the real reason" she was terminated.  *Strothers*, 895 F.3d at 335.  Plaintiff argues she has met her burden because she has raised enough doubt about whether she was framed for purportedly falsifying her inspection reports and mileage logs.  ECF 42, at 22.  Defendant argues there is no genuine dispute because the evidence supporting the legitimacy of the termination decision is so overwhelming that Plaintiff's claims must fail as a matter of law.  ECF 41-1, at 24–25.  To a certain extent, the parties misconstrue Plaintiff's burden.  Plaintiff's burden at this stage is "only to show that the protected activity was a but-for cause of her

termination, *not that it was the sole cause*." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 218 (4th Cir. 2016) (emphasis added).

Thus, even assuming Defendant has shown that it *could* have fired Plaintiff on the basis of inaccurate or falsified documents, that does not necessarily mean that it *would* have fired Plaintiff but-for her EEOC complaint. *See Guessous*, 828 F.3d at 218 (calling the conflation of these concepts a logical fallacy); *see also Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014) ("[I]n retaliation cases, courts must determine what made [the employer] fire [the employee] when it did." (internal citation and quotation marks omitted)).  Stated differently, a plaintiff may survive a defendant's motion for summary judgment if the plaintiff calls the timing of their firing into question by proving that the firing would not have happened *when* it happened if the plaintiff had not engaged in the protected activity.

Additionally, the plaintiff need not provide additional evidence to affirmatively prove defendant's rationale is false if the evidence presented at the prima facie stage is strong enough to demonstrate prejudice.  *Guessous*, 828 F.3d at 220.  Plaintiff need only raise enough doubt that there is a genuine dispute of fact as to whether retaliatory animus was a but-for cause of her termination.  *See, e.g.*, *King v. Rumsfeld*, 328 F.3d 145, 154 (4th Cir. 2003) (Gregory, J., dissenting) ("To survive summary judgment … [the plaintiff] need not squarely rebut his employer's explanation.  Instead, [the plaintiff] must cast sufficient doubt upon the genuineness of the explanation to warrant a jury's consideration of possible alternative and discriminatory motivations for the firing.").  Plaintiff has clearly done so here.

The Court finds *Guessous v. Fairview Property Investments., LLC*, particularly instructive. 828 F.3d 208 (4th Cir. 2016).  In that case, a Muslim, Arab, Moroccan woman's supervisor routinely called Muslims "terrorists," asked the plaintiff repeatedly about middle eastern current

events, and routinely made comments such as calling Muslim Arabs "camel people." *Id.* at 212–13. She confronted her supervisor and asked for the comments to stop. *Id.* at 214. Only seventy-five minutes later, the CEO of the company sent inquiries to other employers to see if they were hiring, saying they had a "wonderful girl" who they simply did not have enough work for. *Id.* at 214. Three months later the plaintiff was terminated due to a lack of work to assign her. *Id.* The district court granted the defendant's motion for summary judgment when it refused to consider the plaintiff's self-serving statements and when plaintiff failed to show defendant's reason was *false* (*i.e.*, that there was so much work to do that her position was an absolute necessity). *Id.* at 218. The Fourth Circuit reversed, explaining that though proving a defendant-employer's firing rationale false is one way to prove pretext, it is not required. *See id.* at 218–19. The Fourth Circuit explained that "a reasonable jury could easily conclude . . . that a termination decision was made only seventy-five minutes after [plaintiff] complained to [supervisor] about past comments and treatment, and that it was motivated by the complaint itself." *Id.* Where the district court had found that same evidence supportive of a prima facie case of retaliation, the strength of that evidence was enough to find a genuine dispute as to pretext. *Id.*

*Guessous* is similar to this case. Here, the Plaintiff has provided evidence that her supervisor, Groff, inquired about filing defamation charges soon after learning of Plaintiff naming him in her EEOC complaint. ECF 48-11 (complaining that her comments "are now being broadcasted to the rest of our Staff" and saying accusations were creating an unpleasant work environment). Upon Plaintiff's return from medical leave, only one month passed before Plaintiff committed a "fireable" offense that Groff happened to discover the very next morning. ECF 41-6, at 54; ECF 41-5, at 13. Groff discovered this discrepancy early enough in the day that he communicated his discovery to Williams, and Williams sent out inquiries to access Plaintiff's

transponder records before 10:55 a.m. just one day after the logs were allegedly falsified.  ECF 41-5, at 13.

A jury may reasonably question this prompt discovery given that this type of offense was never investigated before and had never resulted in a firing before Plaintiff's.  ECF 41-6, at 85 (Exhibit 6, Thomas Report).  Most critically, a jury may reasonably question this prompt discovery because Groff played an active role in the internal investigation, both before and after Thomas got involved.  Thomas commonly reported information he found to Groff, Thomas took Groff's advice about which day to surveil Plaintiff, and Thomas relied on Groff to make phone calls to locate Plaintiff and feed Thomas her real-time location in support of his surveillance activities.  ECF 41-6, at 56–57, 60.

On this basis, a reasonable jury might infer from the evidence that Groff took an abnormal interest in Plaintiff's investigation, demonstrating a desire to get Plaintiff fired.  That inference would be bolstered both by the "defamation email" Groff sent to Fowler on January 30, 2019, and by a comparison to Salgado's investigation, in which Salgado's supervisors had virtually no involvement.  *See* ECFs 48-31, 48-32, 48-33.

A jury could also conclude that there was something abnormal and disproportionate about Plaintiff's investigation, as described in Thomas' report.  ECF 41-6, at 52–85.  That inference would be bolstered by the fact that Salgado's investigation, despite also including allegations that he was diverging from his work schedule, did not include surveillance, like Plaintiff's did.  *See* ECFs 48-31, 48-32, 48-33.

Groff's overt expression of a desire to retaliate, and his active and consistent efforts to investigate Plaintiff for an unusual and never-before-investigated offense, certainly could persuade a reasonable factfinder that Groff made the termination decision around the time of his defamation

email.  A reasonable factfinder could be persuaded that Groff decided he was going to get Plaintiff fired after he learned of her 2018 complaint, and he took his first opportunity to do so.  A jury could infer he would not have noticed her logs' discrepancy, played such an active hand in her investigation, or discounted her rationales presented in mitigation conferences, absent a retaliatory motive.  On this basis alone, Defendant's motion for summary judgment fails on Counts II and V.

As an alternative, this conclusion is bolstered by a number of material factual disputes as it relates to whether Plaintiff was, in fact, framed.  To rebut Defendant's conclusion that Plaintiff falsified the logs, Plaintiff argues others, including Groff, had opportunity and motive to do so.  And while Defendant presents evidence from a business custodian indicating no one modified her inspection log, weighing the evidence and credibility of the evidence is a role reserved for the jury.  *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373.  As to Plaintiff's handwritten mileage logs, the parties offer competing expert witnesses in handwriting analysis with opposing conclusions.  *See* ECF 48-21 (Plaintiff's expert's comprehensive report and associated curriculum vitae); ECF 51-2 (Defendant's expert's report).  Again, weighing the persuasiveness of the experts is a role reserved for the jury.  *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007).

Additionally, there is a genuine dispute of material fact as to whether Plaintiff confessed to the allegedly inaccurate reporting of her mileage and whereabouts.  The perceptions and recollections of the investigatory interview are in sharp conflict, and the meaning of Plaintiff's text message is as well.  ECF 48-29.  What it comes down to is a credibility determination between those present at the meeting.  That credibility determination must be made by the jury.  *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373.

In sum, a reasonable jury could infer from the frequency and depth at which Groff centered himself in Thomas's investigation that Groff was acting to create a pretextual basis for Plaintiff's termination.  This is true even if Plaintiff did commit the offense and Defendant had a legitimate basis to fire Plaintiff.  There is, at minimum, a dispute that Plaintiff's EEOC complaint naming Groff was a but-for cause of her firing and there is a dispute as to whether Plaintiff would have received a less severe sanction, such as a suspension, had she not filed her EEOC complaint.

### 2.    Race and Sex Discrimination Under Title VII and MFEPA

As a preliminary matter, Plaintiff argues that Defendant has not raised any challenge to the sufficiency of the evidence underlying her race and gender discrimination claim, and that the Court should construe Defendant's silence as a concession that Plaintiff has established a prima facie case for race and sex-based discrimination.  ECF 42, at 27 n.36.  The Court acknowledges that Defendant's Motion raises no argument as to why Plaintiff has not met her burden of establishing a prima facie case of race and sex discrimination, ECF 41, at 22–24.  Defendant elects instead to focus argument on the legitimacy of the MVA's termination decision.  ECF 41, at 22–24.  However, in reply, for the first time, Defendant argues that Plaintiff cannot satisfy the second element of a prima facie case of discrimination through comparable instances of employee discipline.  ECF 51, at 9.

Arguments raised for the first time in reply are waived to the extent they are not responding to the non-movant's response.  *See supra* note 16.  The Court's considerations of waiver, however, must be made in light of the procedural posture and respective burdens of the parties: On a Rule 56 motion for summary judgment, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 318 (1986) (internal quotation marks omitted).

Defendant has discharged this initial burden in claiming that Plaintiff's race and gender discrimination claims fail as a matter of law.  ECF 41-1, at 22.  Defendant elected to meet this initial burden by providing evidence that focuses on the legitimate, non-discriminatory basis for Plaintiff's termination decision.  *Id.*  Defendant could have elected to challenge Plaintiff on each point that Plaintiff bears a burden of persuasion, but chose not to do so.  Defendant's election, however, does not eradicate Plaintiff's burden altogether.  Once the movant meets the initial burden to identify evidence that demonstrates an absence of a dispute of material fact, the nonmovant must demonstrate why such a genuine dispute does exist.  As such, the Court may not discharge Plaintiff's burden to establish its prima facie case.

In sum, Defendant's decision to contest Plaintiff's prima facie prong in reply has two consequences: Defendant's reply arguments are waived to the extent they are not responding to Plaintiff's arguments; and such a waiver does not discharge Plaintiff's burden to establish that, in fact, a genuine dispute exists that should proceed to trial.

> *i.*  *Plaintiff has Established a Prima Facie Case of Race and Sex Discrimination.*

In order to make out a prima facie case of discrimination via comparator evidence, Plaintiff must prove: (1) she is a member of a protected class; (2) the prohibited conduct in which she engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) the disciplinary measures enforced against her were more severe than those enforced against those other employees.  *Mahomes v. Potter*, 590 F. Supp. 2d 775, 781 (D.S.C. 2008) (citing *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993)).  Plaintiff identifies Salgado as her comparator in this case.  ECF 42 at 27–35.

Plaintiff has clearly proven the first and third elements.  First, she has proven membership in a protected class as she is an African American woman.[25]  *See Gbenoba v. Montgomery Cnty. Dep't of Health & Hum. Servs.*, 209 F.Supp.2d 572, 576 (D. Md. 2002) (recognizing that African Americans are a protected class), *aff'd*, 57 F. App'x 572 (4th Cir. 2003); *Garrow v. Economos Props., Inc.*, 242 F. App'x 68, 70–71 (4th Cir. 2007) (recognizing women are a protected class). Second, she has demonstrated she experienced a more severe consequence, as she was terminated while Salgado was only suspended for five days.  ECFs 41-6, at 72; 48-35.

The real question is whether Salgado is similarly situated.  *Mahomes*, 590 F. Supp. 2d at 781.  To satisfy her burden, Plaintiff must show she is "similar in all relevant respects" to the comparator, including "that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)); *see Sawyers v. United Parcel Serv.*, 946 F. Supp. 2d 432, 442 n.10 (D. Md. 2013), *aff'd*, 576 F. App'x 199 (4th Cir. 2014); *Short v. Berryhill*, Civ. No. ELH-18-2714, 2019 WL 4643806, at *15 (D. Md. Sept. 24, 2019) (noting plaintiff's failure to allege similar jobs duties, positions, abilities, and supervisor between plaintiff and comparator doomed her claim).

Plaintiff has made such a showing.  Both Plaintiff and Merennege Salgado ("Salgado") were VCAs within the VID.  ECF 48-30 (Salgado Investigative Report); ECF 1, at 3.  They both

---

[25] Defendant raises in reply that Salgado cannot serve as a comparator because he is a member of a different protected class, as he is an Asian man.  ECF 51, at 10.  Defendant cites no caselaw to suggest that a member of a different protected class cannot serve as a comparator.  *Id.*  The Court is unpersuaded by Defendant's unsupported conclusion of law.

worked under Groff and Chafin.  ECF 48-1, at 2; ECF 48-33 (Investigative Report), at 3.  They both were promoted to the VCA II position.  ECF 48-1, at 1 (Gibson Declaration); ECF 48-4 (Salgado Deposition), at 4.  They both engaged in bus inspections across the state and had the responsibility to fill out logs that attested to their mileage and inspections.  ECF 48-1, at 1–2; ECF 48-4, at 19 (discussing mileage log).

The only way in which Plaintiff and Salgado are not situationally identical is in the specific type of misconduct they engaged in.  While Plaintiff was investigated for falsifying bus inspections and mileage logs on one occasion, Salgado was investigated for operating a wholesale car business that violated the MVA's conflict of interest policies, for conducting private business during work hours, and for lying to investigators to avoid discipline.  ECF 48-4, at 24–25 (discussing three occasions he was in person at auctions buying vehicles for his wholesale business while he was supposed to be working at the MVA); ECF 48-34 (sustaining allegations).

In comparing the type of misconduct, the Supreme Court has instructed that "precise equivalence in culpability between employees is not the ultimate question."  *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 293 n.11 (1976).  An allegation that the comparator was involved in an act of "comparable seriousness . . . is adequate to plead an inferential case."  *Id.* at 283 n. 11.  Federal courts must assess the "gravity of offenses on a relative scale."  *Moore v. City of Charlotte*, 754 F.2d 1100, 1107 (4th Cir. 1985).  For instance, similarities or dissimilarities in frequency of misconduct between a plaintiff and comparator can be particularly relevant to an assessment of comparable culpability.  *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir.1997) (work history is a relevant factor in determining comparability).  Courts are more likely to find the plaintiff and comparator are not similarly situated if a plaintiff has engaged in misconduct more frequently than a comparator.  *See Sook Yoon v. Sebelius*, 481 F. App'x 848, 850

(4th Cir. 2012) (finding insufficient comparability when comparators did not have a history of misconduct like the plaintiff); *Gamble v. FCA US LLC*, 993 F.3d 534 (7th Cir. 2021) (finding plaintiff and comparator not similarly situated when plaintiff had two instances of misconduct on his record and comparator had only one). Unlike the plaintiffs in *Gamble v. FCA US LLC* and *Sook Yoon v. Sebelius*, Plaintiff and Salgado both had one prior incident of misconduct, in that they both received three speeding tickets (or the equivalent of three) and had their state driving privileges suspended for three weeks. ECF 48-1, at 6–7; ECF 41-4 (Fowler's Investigatory Documents), at 41 (email communication suspending Salgado after third speeding ticket). The fact that Plaintiff's and Salgado's prior misconduct was identical makes the comparison between the two particularly strong.

Additionally, courts often analyze whether a plaintiff and comparator engaged in the same rule violation or type of rule violation, as similar rule violations are likely to cause comparable harm. *Moore*, 754 F.2d at 1105 ("The most important variables in the disciplinary context, and the most likely sources of different but nondiscriminatory treatment, are the nature of the offenses committed and the nature of the punishments imposed."); *Sook Yoon*, 481 F. App'x at 850 (4th Cir. 2012) (noting differences in the harm caused by various nurses' misconduct when doctors complained of only the plaintiff's conduct and only plaintiff's conduct involved insubordination). In this case, while there were some differences in the ethical violations, there is a question of fact as to whether Salgado also falsified his mileage logs. ECF 48-33 (reporting "12.2" commute miles regardless of whether he drove to "PG" county "Baltimore" or "Howard" county despite the fact that the counties were all varying distances away). Salgado undeniably was not reprimanded as to this despite the investigators sustaining that Salgado lied about being present at work sites when he was actually conducting private business in a completely separate location. ECF 48-34. The

lack of enforcement against this violation in Salgado's case raises serious questions of fact regarding the severity of the falsification of mileage logs and whether such an offense would ordinarily result in termination or even investigation.

The main difference between Salgado and Plaintiff is that Plaintiff was found to have falsified bus inspection logs.  A comparison of the relative severity of employees' misconduct can be made "in light of the harm caused or threatened to the victim or society, and the culpability of the offender."  *Sook Yoon v. Sebelius*, 481 F. App'x 848, 850 (4th Cir. 2012) (quoting *Moore*, 754 F.2d at 1107).  In this case, the potential harm of a falsified bus inspection record is greater than the potential harm of operating a wholesale auto company that presents a conflict of interest because people could be injured if an unsafe school bus were to receive a passing score and go on to transport passengers.  However, Plaintiff also had a great deal of mitigation that Salgado apparently did not have.  In mitigation conferences, Plaintiff's union representative Womble explained Plaintiff's past allegations of discrimination, indicated Plaintiff was not supposed to be assigned to the location where she had been assigned, and explained that the bus inspections Plaintiff purportedly falsified were for buses located in the Eastern Shore.  ECF 48-10, at 2–4.  Thus, even if the potential for harm was greater in Plaintiff's alleged violation, her culpability was arguably lessened.

In a situation like this, where Plaintiff and the comparator allegedly engaged in ethical violations that involved misrepresenting the work they were doing and where they were going, the violations are similar enough to satisfy Plaintiff's prima facie showing, even if the potential of harm was greater in Plaintiff's case.  This is bolstered by the fact that they both had the same misconduct record as neither had been accused of dishonesty or falsification before.  As for culpability, Plaintiff had mitigating circumstances that Salgado did not have: *i.e.*, she feared going

to the Eastern Shore and was trying to escape racial harassment from school bus contractors in Kent County, when she felt her supervisors were not protecting her.  Plaintiff has established a prima facie showing of race-based and sex-based discrimination under Title VII and MFEPA.

In sum, Plaintiff has met her burden to establish a prima facie showing of race-based and sex-based discrimination where she and Salgado both engaged in the similar misconduct and she was terminated, while he received only a five day suspension.

*ii.*　　　*Defendant Fails to Rebut the Presumption of Discrimination.*

Defendant's Motion reiterates that it has articulated a "nondiscriminatory reason for Plaintiff's termination," because it provided evidence of what it considered to be serious ethical violations.  ECF 41-1, at 22–24.  However, merely providing a rationale for termination does not necessarily equate to a legitimate reason for disparate punishment for comparable misconduct. *Kess v. Mun. Emps. Credit Union of Balt., Inc.*, 319 F. Supp. 2d 637 (D. Md. 2004) (holding defendant-employer provided legitimate rationale for disparate punishment of employee by pointing to differing circumstances).

In reply to Plaintiff's opposition, Defendant argues that the comparator is not sufficiently similar because the potential harm of a falsified bus inspection is greater than the potential harm from Salgado's lunch hour auctions.  While this could be a legitimate reason for distinguishing Plaintiff's misconduct and her comparator's misconduct, the Defendant bears the burden of producing evidence that Defendant genuinely believed Plaintiff's misconduct was more serious at the time they imposed a harsher punishment on her.  Defendant cites no record evidence to support this.

As such, Defendant has failed to rebut the inference of discrimination and Defendant's motion for summary judgment as to Counts I and IV must be **DENIED**.

### 3. Discriminatory and Retaliatory Hostile Work Environment under Title VII

Because the workplace environment is one of the "terms, conditions, or privileges of employment," *see Meritor Savs. Bank v. Vinson*, 477 U.S. 57, 64–67 (1986), Title VII creates a cause of action in favor of persons forced to work in a hostile workplace, *see id.* at 66.  A hostile environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 272 (4th Cir. 2015) (quoting *Harris v. Forklift Syss., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted)).

Plaintiff's complaint alleges a hostile work environment under two theories: discrimination and retaliation.  ECF 1, at 17, 19.  Defendant only contests Plaintiff's discriminatory hostile work environment claim and makes no mention of her retaliatory hostile work environment claim.  ECF 41-1, 27-29.  On a Rule 56 motion for summary judgment, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (internal quotation marks omitted).  As such, Plaintiff's retaliatory hostile work environment claim remains unchallenged and the Court considers only Plaintiff's discriminatory hostile work environment claims.  *See* ECF 1, at 17, 19 (alleging both discriminatory and retaliatory hostile work environment claims under MFEPA and Title VII).

A prima facie discriminatory hostile work environment claim requires a plaintiff to show "(1) unwelcome conduct; (2) based on the plaintiff's sex [or race]; (3) sufficiently severe or

pervasive to alter the plaintiff's conditions of employment and create an abusive work environment; and (4) that is imputable to the employer." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 117 (4th Cir. 2021).  Defendant's Motion targets the third and fourth element.[26]  After reviewing the arguments and evidence presented by the parties, Plaintiff has succeeded in showing the conduct at issue was severe and/or pervasive and that conduct from external customers was imputable to employer.  Accordingly, Defendant's motion for summary judgment on this count must be denied.

---

[26] Plaintiff has satisfied her burden on the first two elements.  Defendant has not and cannot allege that the racially charged and threatening conduct Plaintiff alleges, was welcome.  Plaintiff's deposition and declaration sufficiently allege this conduct was unwelcome. ECF 48-1; 48-3. Furthermore, the incidents Plaintiff describes are clearly related to Plaintiff's sex and race because many of the comments from the school bus operators and school board representatives explicitly mentioned her sex and race.  *See* ECFs 48-11, at 2–9; 41-18.

Furthermore, "[a] woman may prove sex-based discrimination in the workplace even though she is not subjected to sexual advances or propositions."  *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331–32 (4th Cir. 2003) (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).  A trier of fact may reasonably find discrimination, for example, when a woman is the individual target of open hostility because of her sex, *Smith*, 202 F.3d at 242–43, or when "a female victim is harassed in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace," *Oncale*, 523 U.S. at 80." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331–32 (4th Cir. 2003).  The Plaintiff's status as the sole woman among eight VCAs, her supervisor's repeated promise not to hire another woman, her experience of being called a "bitch" while on assignment, her being singled out at weekly meetings for her driving, her being called "it" and "Whoopi Goldberg," and her being sent on assignments to "toughen her up," raises at least a genuine dispute of material fact as to whether the harassment she experienced was based on her sex.  ECF 41-8, at 11 (Gibson Deposition) ("Groff has said on countless occasions that he had hired a woman, and he would never make that mistake again."); ECF 41-8, at 19 (Whoopi Goldberg comment); ECF 48-8, at 19 ("I'm going to make tougher skin. I'm going to make you do the things that you say scare you"); ECF 48-1, at 2– 5 ("it" comment, "bitch" comment, and allegation coworkers called her "dumb"); ECF 41-8, at 13 (Groff's weekly comments at Friday meetings that "[y]ou don't want to be like Mashelia").

*i.*      *Imputable*

Defendant argues that Plaintiff cannot establish liability for sex or race-based harassment based upon the conduct of outside contractors.  ECF 41-1, at 28.  An employer is liable under Title VII for the actions of third parties only if the employer is negligent, such that they knew or should have known of the harassment and failed to take "prompt remedial action reasonably calculated to end the harassment."  *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 423 (4th Cir. 2014) (quoting *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995)).

Defendant alleges that Plaintiff has not "shown any evidence that a reasonable jury could conclude that the MVA knew or should have known of the race and/or sexual harassment" because Plaintiff did not write any formal complaints about the third-party incidents contemporaneously. ECF 41-1, at 29.  However, a formal complaint is not required to put an employer on notice of third-party harassment.   In *Freeman*, the very case that set out the negligence standard for employer liability of third parties in Title VII cases in the Fourth Circuit, the plaintiff did not present any formal written complaints to prove her employer's knowledge; she alleged instead that her supervisors had knowledge because they were present during the incidents.  *Freeman*, 750 F.3d at 423.

Contrary to Defendant's assertion, Plaintiff has raised a genuine dispute of material fact as to whether Groff was informed of these incidents contemporaneously.  Plaintiff testifies that on the dates the incidents occurred, she recalls informing Groff, and in some instances, she recalls Groff's response.  *See, e.g.*, ECF 48-1, at 4.  Additionally, Plaintiff testified that during the meeting with Rodgers, Groff made statements admitting that he had been told of prior conduct.  *Id.* at 8. Groff testifies he knew nothing about these incidents until this meeting, ECF 41-16, at 3–4, creating a factual dispute that depends on a jury's determination of the credibility of the witnesses. *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373.  Additionally, Plaintiff alleges she was told she

complains *too often*.[27]  ECF 48-1, at 3.  Taking these facts in a light most favorable to Plaintiff, a reasonable jury could find Plaintiff had a habit of telling Groff her complaints, and that Groff was informed about each incident but took no actions to remediate before Rodgers got involved.

Defendant also argues that the MVA took adequate steps to address the harassment when they became aware of it after a meeting with Rodgers and Groff in January 2018.  ECF 41-1, at 29.  Defendant does not mention what those adequate steps were.  *Id.*  The only mention of remediation in Defendant's brief comes from Investigator Fowler's report, in which Groff said he told the Plaintiff that if she felt unsafe, she should leave and call management.  ECF 42-1, at 14.  Considering that: (1) Plaintiff was travelling to remote parts of the state, sometimes onto private property of school bus owners; (2) for random inspections, she was arriving completely unannounced; and (3) considering Plaintiff's past experience being told that people "shoot first and ask questions later," a reasonable jury could find this "just leave" approach was inadequate when the nature of the danger could make it impossible for Plaintiff to leave safely.  ECFs 48-1, at 2; 41-8, at 12, 21.

Defendant also implies the MVA took adequate remedial action because they stopped sending Plaintiff to counties where the racist incidents occurred.  ECF 41-1, at 29.  Defendant argues that the MVA could only have taken action in response to incidents they knew about, and they did not know anything about the Eastern Shore.  ECF 41-1, at 29.  They only knew about incidents in "Elkton, Carroll County, Harford County," and these incidents in "Western [and] in Northeastern Maryland" made it impossible to foresee issues on the Eastern Shore.  ECF 41-1, at 29.  This attempt to eschew MVA's responsibility to protect Plaintiff from foreseeable harm is

---

[27] For instance, the record shows that when plaintiff was followed by a strange car on July 16, 2019, she called Groff immediately to inform him.  ECF 48-1, at 11.

questionable, both because Defendant's position may be factually incorrect[28] but more importantly because foreseeability is about more than mere geography; discrimination does not start or stop along county lines.  A reasonable jury could conclude that Plaintiff was complaining about racial and sexist incidents that occurred when she was dispatched to remote, rural areas, where she was in the minority demographic and that the MVA failed to effectively remediate the harassment. *See, e.g.*, ECF 48-1, at 6 (describing an incident in which Plaintiff was left "alone in a remote area, with irregular, weak cell phone coverage" in Garrett County).  Plaintiff has met her burden to demonstrate there is a genuine dispute of material fact as to whether Defendant agreed to take precautions and to avoid sending Plaintiff to places where she had experienced threatening incidents in the first place.  ECF 48-10 (Womble Declaration), at 3–4 (testifying Defendant agreed to take precautions or to avoid sending Plaintiff to places where she had experienced threatening incidents).  Additionally, there is a genuine dispute as to whether Defendant followed through with that promise when Defendant assigned Plaintiff to perform low priority inspections alone in Kent County.

In sum, instances of a supervisor failing to take effective action to stop or prevent harassment may be enough to hold an employer liable for a hostile work environment.  *See Webster v. Chesterfield Cnty. Sch. Bd.*, 38 F.4th 404, 415 (4th Cir. 2022) ("An employer may be held liable for a hostile work environment if it knew or should have known about the harassment and failed

---

[28] While it may be surprising to some, Elkton, in Cecil County is technically on the Eastern Shore. *See Maryland's Eastern Shore*, MARYLAND.COM https://www.maryland.com/regions/marylands-eastern-shore/ (last accessed 11/29/2023).  It is up to the jury, however, to determine whether MVA took adequate steps to address Plaintiff's allegations that she regularly faced racism and sexism on the job and her supervisors were aware of these experiences and failed to address it.  *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 603 F. Supp. 3d 369, 373 (E.D. Va. 2022) (noting it is the jury's responsibility to make credibility determinations and weigh the evidence).

to take effective action to stop it by responding with remedial action reasonably calculated to end the harassment." (internal quotation marks omitted)).  On this record, a jury could reasonably find that Plaintiff's supervisors failed to take effective remedial action to prevent future harassment.

Therefore, a triable question exists as to Plaintiff's reporting of third-party incidents to Groff, and such reporting could allow liability to be imputed to the MVA for the incidents Plaintiff experienced at the hands of third-party bus owners.  There is sufficient indication that such reporting may have occurred to raise a triable question of fact.

                    ii.      *Severe or Pervasive*

Conduct is "severe or pervasive" only when it creates both an objectively and subjectively hostile work environment.  *Harris*, 510 U.S. at 21–22 (noting this standard is a "middle path between making any conduct actionable that is merely offensive and requiring the conduct to cause a tangible psychological injury"); *id.* at 22 (noting "[t]his is not, and by its nature cannot be, a mathematically precise test").

Defendant first argues that Plaintiff has failed to allege a subjectively hostile work environment.  ECF 41-1, at 26–27.  Defendant argues that Plaintiff did not provide evidence that she complained of the abusive conduct "outside of work until well after the alleged incidents occurred." ECF 41-1, 27–29.  Comparing Plaintiff's behavior to the plaintiff in *Freeman v. Dal-Tile*, Defendant says, Plaintiff has not offered evidence that she "took time off from work, cried at work, took medical leave or sought professional help."  750 F.3d 413 (2014).  ECF 41-1, at 27. However, in Plaintiff's declaration, she testified that the incidents of racist and sexist comments from school bus operators, local school board operators, and coworkers and supervisors "individually and cumulatively had a devastating debilitating effect on [her] mental health."  ECF 48-1 ¶ 16.  She testified she was diagnosed with "severe anxiety and depression" and placed on "psychotropic medications."  *Id.*  The subjective inquiry can be satisfied by only looking to the

45

testimony of the plaintiff. *EEOC. v. R&R Ventures*, 244 F.3d 334, 339 (4th Cir. 2001). Additionally, Plaintiff testifies that she continuously complained of her treatment, again demonstrating that, to her, the conduct was abusive. ECF 48-1, at 1–5. This is supported by declarations from her union representative Womble, who testifies that Womble spoke with MVA Administrator Nizer about these incidents to prevent them from reoccurring. ECF 48-10, at 3–4.

Notably, there is additional evidence that the harassment had a subjective impact on Plaintiff because even Groff noticed that when Plaintiff was assigned to the Eastern Shore, she would often call out. ECF 41-6, at 60. Viewing that fact in a light most favorable to Plaintiff, her calling out to avoid more racial and sex-based harassment supports her contention that she had an ongoing fear of being subjected to racial and sexist mistreatment.

Second, Defendant argues Plaintiff has not alleged an objectively hostile work environment. Under the objective inquiry, a court must "look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (quotation marks omitted). This is a "high bar." *Id.* Yet Plaintiff undoubtedly clears it, as explained next.

Defendant's only argument on this point is that the instances Plaintiff complains of are too infrequent to be severe or pervasive. ECF 41-1, at 28 (arguing there were only "4 instances over [sic] almost 9 month period conducted . . . by outside contractors"). Additionally, Defendant argues there is only one instance in which Plaintiff alleges Groff made inappropriate comments, when he commented on two black employees driving together. ECF 41-1, at 28. Defendant only

contests pervasiveness; any argument about the severity of Plaintiff's allegations is noticeably absent. *Id.*

While Defendant is correct that pervasiveness is often determined by reference to frequency, courts "do not look to the number of incidents in a vacuum." *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023). Rather, courts consider "the frequency of the [allegedly] discriminatory conduct" in the context of a given case. *Harris*, 510 U.S. at 23; *see also Okoli v. Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011) (reversing summary judgment when plaintiff experienced more than twelve incidents involving "fondling, kissing, propositioning," and sexual comments in "just four months"). Additionally, even "an isolated incident of harassment, if extremely serious, can create a hostile environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 285–87 (4th Cir. 2015) (finding genuine dispute of material fact as to whether isolated use of a racial slur was sufficiently severe to create a hostile work environment because it could be deemed physically threatening or humiliating); *Anderson v. G.D.C., Inc.*, 281 F.3d 452 (4th Cir. 2002).

Thus, in considering whether the Plaintiff's case is sufficient to go to a jury, the Court must consider the context and quality of the incidents. Viewing the evidence in a light most favorable to Plaintiff, she alleged more than just four incidents, as Defendant suggests. She alleges: (1) comments from Groff that two African Americans should not drive together; (2) comments from a coworker that a former African American employee deserved to be shot; (3) comments that Groff refused to hire another woman VCA again; (4) coworkers refusing to call Plaintiff by her name and instead calling her "Whoopi Goldberg"; (5) comments from a co-worker referring to her as "it" and telling school board representatives to disregard "it"; (6) the "bear taser" incident, in which a school bus operator drove in circles around Plaintiff screaming "get the fuck off my property"

47

and then said "I only see two black people wearing all black" and "around here we shoot first, ask questions later" before pulling out a bear taser and large snake, and releasing a guard dog; (7) the mastiff dog incident, in which a Caucasian male owner released a large mastiff guard dog that lunged at plaintiff during an inspection; (8) being called a "nappy-headed nigger" by a Caucasian male bus company owner who had confederate flags flying in his buses; (9) being cut off by a driver in Calvert County while on MVA business who screamed "pull over you black bitch" and "fuck you" and blew exhaust smoke into her windshield; (10) conducting an inspection in Carroll County and a school official saying "no one told us that you were black" in a rude manner; and (11) being denied access to a restroom by a Caucasian male mechanic, who gestured to a "whites only sign" and provided her a bucket to urinate in.

The allegations cumulatively are severe and/or pervasive enough to survive a motion for summary judgment.  By any objective and reasonable standard, the allegations here are far beyond "simple teasing [and] offhand comments."  *Faragher*, 524 U.S. at 788 (internal quotation marks omitted).  Indeed, some of the incidents may have been severe enough to be actionable in and of themselves.[29]

The cumulative effect of Plaintiff's allegations is at least as severe as other conduct the Fourth Circuit and other circuits across the country have found objectively severe.  *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015) (holding genuine issue of

---

[29] The "whites only" bathroom sign and urination bucket is a particularly egregious allegation.  A whites-only sign, like a "slave-master's whip" or the image of a noose is "deeply a part of this country's collective consciousness and history."  *Tademy*, 614 F.3d at 1142 (noose); *Johnson v. Potter*, 177 F.Supp.2s 961, 965 (D. Minn. 2001) (whip).  A jury is entitled to consider how a reasonable African American woman would construe the "whites only" sign and a urination bucket in light of this context and history.

material fact existed as to whether apparent supervisor's use of a racial slur towards employee twice was severe conduct); *Sharp v. S&S Activewear*, L.L.C., 69 F.4th 974, 981 (9th Cir. 2023) (finding sexually graphic and violently misogynistic music was sufficiently severe or pervasive to sustain a hostile work environment claim); *Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1202 (9th Cir. 1991) (holding workplace atmosphere was "unquestionably polluted" where a Black plaintiff "was surrounded by racial hostility, and subjected directly to some of it"); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1114–16 (9th Cir. 2004) (holding that a Black plaintiff sufficiently alleged a hostile work environment based, in part, on hearing "racial insults" and seeing "racist graffiti . . . in the bathroom and on equipment"); *Tademy*, 624 F.3d at 1144 (finding cumulative effect of numerous racist acts including a life-sized lynching noose was sufficiently severe to survive summary judgment); *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 688, 675 (7th Cir. 1993) (concluding that cumulative weight of several isolated racial comments was sufficiently severe to survive summary judgment).

In sum, viewing the cumulative effect of all of Plaintiff's allegations of a discriminatory hostile work environment, a jury could reasonably find that these allegations are severe or pervasive. *See Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 193 (4th Cir. 2000) (holding district court erred in evaluating nine types of misconduct in disaggregate fashion); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562–63 (6th Cir. 1999) (evidence of sexually related remarks, foul language, and mean and inequitable treatment by co-workers gave rise to a jury question, because impact of separate successive incidents may accumulate to create hostile environment); *Tademy*, 624 F.3d at 1144 (finding cumulative effect of numerous racist acts including a life-sized lynching noose was sufficiently severe to survive summary judgment);

*Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 688, 675 (7th Cir. 1993) (concluding that cumulated weight of several isolated racial comments was sufficiently severe to survive summary judgment).

Therefore, because Plaintiff has identified genuine issues of material fact as to both of the above-contested elements for her discriminatory hostile work environment claim, Defendant's summary judgment motion as to Counts III and V is **DENIED**.

## IV.    CONCLUSION

For the reasons indicated above, Defendant's Summary Judgment motion as to all counts is **DENIED**.  Finally, Defendant's motion to strike, ECF 50, and Plaintiff's motions to strike, ECF 54, 58, are **DENIED**.

Dated: January 4, 2024                                    _____/s/_____

                                                                    Brendan A. Hurson
                                                                    United States District Judge